Raymond E. SHETTERLY, Jr. and Gayle
    E. Shetterly, his wife, John E. Bibel and
    Betram E. Bibel, his wife, Cheryl B.
    Holmes and John Holmes, her husband,
    Frank S. Miller and Amy Miller, his
    wife, Elaine Grinarml, William Baker
    and Colleen Baker, Doreen Kapfer, and
    Robert Dezardo and Vickie Dezardo,
    his wife, Plaintiffs,

v.

CROWN CONTROLS
CORPORATION, Defendant.

Nos. 84–647, 84–1952, 84–1954, 84–1956,
84–1957, 85–0182, 86–101 and 88–1639.

United States District Court,
W.D. Pennsylvania.

July 13, 1989.

Lawrence R. Chaban, Yablonsi Costello & Leckie, Washington, Pa., for plaintiffs.

Mary L. Silverberg, Alder Cohen & Grigsby, Pittsburgh, Pa., for defendant.

## OPINION AND ORDER

SIMMONS, District Judge.

These eight cases come before this Court on complaints filed by certain employee plaintiffs and their spouses against the defendant. Each complaint alleges that the plaintiffs were injured while using a Crown Controls Rider Pallet Truck, Model 60 PE, while in the course of their employment at Fox Grocery. Each employee plaintiff is a warehouse picker for Fox Grocery and in performing their job are required to use these pallet trucks to gather groceries for shipping to the stores supplied by Fox Grocery. The injuries occurred to the various plaintiffs when the pallet truck allegedly ran over a foot of said plaintiff. (specific descriptions of the injuries are set forth in each complaint.)

In each complaint filed in this case, plaintiffs alleged that their injuries were suf-

fered "by reason of the defective and unreasonably dangerous condition" of the Crown Pallet Truck. *See*, paragraphs 20 and 21 of the complaint filed by each plaintiff.

Although plaintiffs asserted causes of action based on negligence, breach of warranty and strict products liability, their counsel has advised that plaintiffs intend to proceed at trial only on a cause of action based on strict products liability or Restatement of Torts Second Section 402A.

The elements of a Sec. 402A case in Pennsylvania are set forth succinctly in *Schriner v. Pennsylvania Power & Light Co.*, 348 Pa.Super. 177, 501 A.2d 1128 (1985). To prevail, a plaintiff must establish the following:

1. a product;
2. a sale of product;
3. a user or consumer;
4. defective condition, unreasonably dangerous and
5. causation.

If any of these requisite elements remains unsatisfied, Sec. 402A has no applicability. *Id.* 501 A.2d at 1132.

Prior to submitting the case to a jury, the trial judge must determine whether the product is "unreasonably dangerous".

Whether or not a product is "unreasonably dangerous" is a social policy matter that is determined by the trial judge and is now settled law in Pennsylvania.

"When a products liability claim is pleaded the trial judge makes a threshold determination whether as a matter of social policy the case is appropriate for treatment under the rubric of products liability. In making this determination the judge acts as a combination social philosopher and risk-utility economic analyst. *Carrecter v. Colson Equipment Co.*, 346 Pa. Super. [95] at 101 n. 7, 499 A.2d [326] at 330 n. 7 [1985]".

See also footnote No. 6, in *Ellis v. Chicago Bridge & Iron Co.*, 376 Pa.Super. 220, 545 A.2d 906 (1988).

These threshold judicial determinations spring from an analysis of the Supreme Court of Pennsylvania's decision in the case of *Azzarello v. Black Brothers Company, Inc.*, 480 Pa. 547, 391 A.2d 1020 (1978).

The Pennsylvania Superior Court in the case of *Brandimarti v. Caterpillar Tractor Co.*, 364 Pa.Super. 26, 31, 527 A.2d 134 (1987), in discussing *Azzarello* stated:

"In *Azzarello* the Supreme Court was asked to consider whether it was proper to instruct the jury using the term 'unreasonably dangerous' and the Court concluded that the jury should not be so instructed. The Court stated 'even if we agree that the phrase "unreasonably dangerous" serves a useful purpose in predicting liability in this area, it does not follow that this language should be used in framing the issues for the *jury's* consideration.' *Id.* 480 Pa. at 558, 391 A.2d at 1026.

'While a lay finder of fact is obviously competent in resolving a dispute as to the condition of a product, an entirely different question is presented where a decision as to whether that condition justifies placing liability upon the supplier must be made.

Should an ill-conceived design which exposes the user to the risk of harm entitle one injured by the product to recover? Should adequate warnings of the dangerous propensities of an article insulate one who suffers injuries from those propensities? When does the utility of a product outweigh the unavoidable danger it may pose? These are questions of law and their resolution depends upon social policy. Restated, the phrases "defective condition" and "unreasonably dangerous" as used in the Restatement formulation are terms of art invoked when strict liability is appropriate. It is a judicial function to decide whether, under plaintiff's averment of the facts, recovery would be justified; and only after this judicial determination is made is the cause submitted to the jury to determine whether the facts of the case support the averments of the complaint. They do not fall within the orbit of a factual dispute which is prop-

erly assigned to the jury for resolution.'

*Id.* at 556, 558, 391 A.2d at 1025, 1026 (footnote omitted).

Courts and commentators have expressed some criticism of the principle espoused in Azzarello to the effect that public policy concerns in a strict liability case are for the courts to consider rather than the jury. *See McKay v. Sandmold Systems Inc.* 333 Pa. Super. 235, 482 A.2d 260 (1984). Nevertheless, the court in *McKay* recognized that the present state of the law is as set forth in *Azzarello* and it is not within this court's province to change existing Law. *Id.* at 245, 482 A.2d at 266. More recently, this court sitting *en banc* in *Dambacher by Dambacher v. Mallis,* 336 Pa. Super. 22, 485 A.2d 408 (1984), *allocatur granted, appeal dismissed,* 508 Pa. 643, 500 A.2d 428 (1985), reiterated the rule of *Azzarello.* Therein, it was noted that it is often difficult for a court to decide whether as a matter of social policy a jury should be permitted to impose strict liability. In a footnote the court listed factors a trial judge should consider when making his social policy decision. *Id.* at 50, 485 A.2d at 423."

Pennsylvania Courts have apparently followed the lead of the Courts in California in promulgating appropriate factors and procedures for the trial court to follow in making the required threshhold social policy decisions above-noted.

In the case of *Dambacher by Dambacher v. Mallis,* 336 Pa.Super. 22, 50, 485 A.2d 408 allocatur granted, appeal dismissed, 508 Pa. 643, 500 A.2d 428 (1985), the Superior Court stated:

"Courts and commentators have identified various factors that a court should consider when making the social policy decision required by *Azzarello* and made in *Lobianco* [*v. Property Protection,* 292 Pa.Super. 346, 437 A.2d 417].[5]

[5]. The California Supreme Court has identified the following factors: the gravity of the danger posed by the challenged design; the likelihood that such danger would occur; the mechanical feasibility of a safer design; the financial cost of a safer design; and the adverse consequences to the product and to the consumer that would result from a safer design. *Barker v. Lull Engineering Co., Inc.,* 20 Cal.3d 413, 431, 143 Cal. Rptr. 225, 237, 573 P.2d 443, 445 (1978). Dean Wade has formulated a similar list:

(1) The usefulness and desirability of the product—its utility to the user and to the public as a whole.

(2) The safety aspects of the product—the likelihood that it will cause injury, and the probable seriousness of the injury.

(3) The availability of a substitute product which would meet the same need and not be as unsafe.

(4) The manufacturer's ability to eliminate the unsafe character of the product without impairing its usefulness or making it too expensive to maintain its utility.

(5) The user's ability to avoid danger by the exercise of care in the use of the product.

(6) The user's anticipated awareness of the dangers inherent in the product and their avoidability, because of general public knowledge of the obvious condition of the product, or of the existence of suitable warnings or instructions.

(7) The feasibility, on the part of the manufacturer, of spreading the loss of setting the price of the product or carrying liability insurance.

*Wade, supra* at 837–38 (footnote omitted) [Wade, on the Nature of Strict Tort Liability for Products, 44 Miss. L.J. 825 (1973).]"

Further, as pointed out in the *Dambacher* case, *supra,* 336 Pa.Super. at 51, 485 A.2d 408, the defendant manufacturer has the procedural privilege of moving the trial court to make specific fundings of fact as to its threshhold ruling on the social policy that *Azzarello* requires when the Superior Court stated in footnote 6, the following:

"6. Nothing in *Azzarello* precludes a supplier or manufacturer, by appropriate motion, from asking the trial court to make explicit its ruling on the threshold determination of social policy that *Azzarello* requires. In the absence of such a

motion, it will be presumed that the court, by permitting the case to go to the jury, resolved the threshold determination against the defendant."

In these cases at bar, the Defendant Crown has moved this trial court to make specific rulings on the threshold questions of social policy as the same pertains to this case.

If a request is made by a party, the trial judge should be required to articulate the reasons for his/her decision on the question of "social policy" and to identify the facts upon which the decision is based so that said judicial decision can be tested to determine if it is arbitrary or capricious.

In light of the Defendant Crown's requests for special findings of fact and conclusions of law in regard to the social policy issue, and further in light of the requirement that this trial judge should identify certain facts that this trial judge should first consider in order to properly make the social policy decisions, a fact hearing relating to the concepts of "unreasonably dangerous" and "risk-utility" was held in order to properly determine the social policy question.

As stated in *Hon v. Stroh Brewery Co.* 835 F.2d 510, 512 (3rd Cir.1987) the trial court first must take the allegations of the complaint to be true preliminary to making a determination as to whether the plaintiff makes a *prima facie* showing that the claimed injury was proximately caused by the product's design.

This trial judge after examining the pleading of the plaintiff determined that a *prima facie* showing was made that the alleged injuries were proximately caused by the product's design and shifted the burden of proving the legal efficacy of the risk-utility issue and whether the product was "unreasonably dangerous" to the defendant.

At the hearing, this trial court indicated that it was relying on *Barker v. Lull Engineering Co.*, 20 Cal.3d 413, 143 Cal.Rptr. 225, 573 P.2d 443 (1978) as authority for its holding that the ultimate burden of proof on the risk-utility issue is shifted to the

defendant. (Barker was cited with approval in *Dambacher*).

The precise holding of *Barker* and the rationale for that holding is clearly set forth within the *Barker* Court's opinion. "Because most of the evidentiary matters which may be relevant to the determination of the adequacy of a product's design under the 'risk-benefit' standard —e.g., the feasibility and cost of alternative designs—are similar to issues typically presented in a negligent design case and involve technical matters peculiarly within the knowledge of the manufacturer, we conclude that once the plaintiff makes a *prima facie* showing that the injury was proximately caused by the product's design, the burden should appropriately shift to the defendant to prove in light of the relevant factors, *that the product is not defective.*" 573 P.2d at 455.

As above noted, the well-grounded reasoning of the California Courts in *Barker* has been followed by Judge Spaeth's exhaustive opinion in *Dambacher,* cited *supra* which has been approved by the Pennsylvania Supreme Court.

Although plaintiffs do concede that Sec. 402A does require the trial court first to make a risk-utility determination before a product liability case can ever be submitted to a jury. *See, Plaintiffs' Brief* at 3, nevertheless, their brief asserts that such a determination is to be made with no reference to factual matters. The very recent Superior Court decision of *Ellis v. Chicago Bridge & Iron Co.*, 376 Pa.Super. 220, 545 A.2d 906 (1988) lays Plaintiff's argument to rest.

In *Ellis,* the Superior Court (i) held that as a matter of law, *based on the facts presented at trial,* the lower court should have resolved the "unreasonably dangerous" issue in favor of the defendant-manufacturer; (ii) vacated the jury verdict in favor of the plaintiff; and (iii) dismissed plaintiff's case, 545 A.2d at 914–15. The holding of *Ellis,* is two-fold: (i) a design aspect of a product cannot be a "defective condition", unless that design aspect renders the product "unreasonably danger-

ous" and (ii) the trial court resolves the "unreasonably dangerousness" issue *based on the factual* evidence presented *Id. Ellis* 545 A.2d at 910–11, 914–15. *Ellis* makes clear that unless the "unreasonably dangerousness" issue is resolved by the trial court in favor of a plaintiff, the defectiveness issue is not to be submitted to the jury. *Id.* 545 A.2d at 910, fn. 6. Moreover, *Ellis* acknowledges that the determination of "unreasonably dangerousness" is to be made by the court using a risk-utility analysis. *Id.*

Further, as a matter of common sense this trial Judge could never intelligently and fairly determine the social policy question in these cases without first obtaining factual information as for an example: whether the product is useful and desirable; whether the product is likely to cause injury; whether the product will cause serious injury; whether a substitute product is available which meets the same need, etc. (*See* list of Dean Wade's factors, cited above, which require a factual basis relevant to the product in question in order for the trial court to intelligently consider these factors in coming to a fair and just social policy decision.)

Because this trial Judge sensed "early on" that a pre-trial "risk-utility" hearing was the only feasible way to establish the underlying facts necessary to intelligently address the seven factors to be considered when this Judge must act as a combination "social philospher and risk-utility economic analyst" (since as in this case, as in all cases, this Judge's judgment is only as valid as the facts upon which he bases it), an extended pre-trial "risk-utility" hearing was held and this Judge actually went on an official "view" of the warehouse in question and saw first hand how the pallet trucks in question were operated in the areas where the accident occurred.

This Judge learned the following in the course of his "view" and from the testimony presented on the record at the view and in the court room:

The Crown Pallet Truck is essentially an engine powered vehicle to which is affixed a motorized set of forks or supports close to floor level; the forks support wooden pallets upon which are stacked selected cartons of groceries that will constitute an order in the process of being filled for a retail grocery store. Unlike many forklift trucks that are designed such that the forks can be raised to relatively high elevations, the Crown Pallet Trucks forks can only be raised a few inches from the floor. The control arm (the steering and braking mechanism) is located at the front end of the pallet; perpendicularly attached to the control arm are two handles which the operator grasps as he operates the pallet truck as a rider or as he stands or walks on the side of said machine. The forks of the pallet trucks at Fox are approximately eight feet long and are located behind the body of the pallet truck. Thus, the operator is operating the pallet truck at a location which can be up to ten feet forward of the point where he will be placing heavy grocery cartons.

The Crown Pallet Truck serves essentially the same function as a grocery cart used by a customer of a retail grocery store. Unlike a grocery cart which is pushed by hand, the Crown Pallet Truck is a motorized vehicle. The operator of the Crown Pallet Truck proceeds up and down the aisles of a grocery warehouse (instead of the aisles of a grocery store), placing the selected boxes or cartons of groceries that make up the order on the forks of the Crown Pallet Trucks (instead of inside the basket of the grocery cart). Unlike the basket of a grocery cart which is located within inches of the customer, the forks are located several feet from the position from which the pallet truck is operated. The operator then proceeds to transport the order to a loading dock (instead of the check out lane) for delivery by truck to the retail grocer.

The Crown Pallet Trucks are designed for two modes of operation: (i) walk beside operation when its operator has a relatively short distance between "picks" (the grocery items to be selected) and (ii) riding operation when the distances the operator must travel are relatively long. When riding the Crown Pallet Truck, the operator

stands on a platform at the front of the Crown Truck.

Because the grocery items selected by the operator and placed on the forks are frequently stacked several feet high, smooth operation and stability of the Crown Pallet Trucks are necessary. Excessive rocking or rapid stops (i) would cause the cartons placed on the forks to shift or fall off the pallets and (ii) create a hazard by exposing the operator to the risk of being thrown from the Crown Pallet Truck, or of being struck by the falling cartons while he is riding it.

The Crown Pallet Trucks are equipped with a "coast control device" which, if used by the operator, permits the pallet truck to coast slowly to a stop so that the operator can eliminate several additional steps each time he dismounts from the truck to pick an order. If an operator releases the control handle when he has alighted from the truck beside the grocery item he is to pick and the coast control device is in the operative position, the Crown Pallet Truck will coast slowly to a stop so that when it has stopped the pallets are then directly beside the operator who is standing in the aisle (instead of several feet behind him), eliminating additional steps and the strain of carrying heavy grocery cartons the distance between the pick and the forks. Crown incorporated this feature into the Crown Pallet Trucks because users indicated this feature was essential in terms of relieving operator fatigue and increasing the productivity of the operator. Moreover, Crown personnel, during field observations during the development phase of the Crown Pallet Trucks, found that competitors' pallet trucks had been altered by operators by wedging a block of wood between the control arm and the drive unit to completely negate the braking system. Crown engineers worked to develop a system which would provide the operator with the utility of the wooden block but which would eliminate its undesirable effect on the ability of the operator to brake the Crown Pallet Trucks. Use of the coast control device is at the option of the operator and can be disengaged by simply reversing the position of the spring device located at the base of the control handle. Although optional, Fox employees prefer to operate the Crown Pallet Trucks with the coast control device in the operative position.

The height of the platform from the floor serves two purposes. First, it allows the Crown Pallet Truck (i) to be used on inclines without scraping the floor, (ii) to maneuver over dock plates and (iii) to pass over, without hitting, debris often found on the floors of grocery warehouses thus decreasing the likelihood of unintended and dangerous stops. In fact, this feature was one of the reasons that Fox decided to purchase the Crown Pallet Trucks. Fox determined during its testing of several manufacturers' pallet trucks that Fox's intended use of the pallet trucks required enough clearance to traverse inclines and dockplates. Fox at the time the various manufacturers brought their pallet trucks into the Fox warehouse for evaluation measured the distance of each such pallet truck from the floor because certain manufacturers' equipment had "gotten hung up" (i.e. hit the floor or the dockplate—similar to the effect experienced when an automobile goes down a steep driveway to a flat road surface and the bumper hits the road) during testing. Second, the height of the platform from the floor lessens the risk of certain other injuries which may occur in the operation of the Crown Pallet Truck, such as pinched toes, and injuries resulting from unintended stops.

In addition, Fox intended to use the Pallet Trucks (i) to increase the productivity of its employees performing the assembly function, (ii) to reduce its costs by increasing operating efficiencies, (iii) to reduce operator fatigue and back injuries thus enabling the assembly function to be performed in an easier and safer manner and (iv) to remain competitive in the grocery warehousing industry.

A fair summary of the testimony taken at the hearings is as follows:

In October 1981, Fox purchased 30 Crown Pallet Trucks for its Belle Vernon warehouse at a cost of approximately

$7,000 per Truck.[1] Over the next four years, several accidents occurred when an assembler walked in front of and was struck by the Crown Pallet Truck he was operating. Despite these accidents, Fox continued to purchase Crown Pallet Trucks; at the time of the hearings Fox had approximately 80 Crown Pallet Trucks in operation at its Belle Vernon warehouse.[2] Prior to October, 1981, assemblers (operators of the pallet trucks who pick grocery orders) had used a Barrett "ox" for picking orders.[3] The employees found it "considerably easier" to perform their jobs with the Crown Pallet Truck than with the Barrett ox.[4]

In September 1982, Fox implemented production standards for its employees which substantially increased the number of grocery cartons that an assembler would be required to pick during an eight hour shift.[5] Each plaintiff who testified at the hearings admitted that the new production standards could not have been met using the Barrett ox.[6] After the Crown Pallet Trucks were put into service, assemblers were able to pick 53% more product during an eight hour shift than they had been picking with the Barret oxes.[7] With the implementation of the Crown Pallet Trucks and the production standards, Fox was able to reduce its assembly costs at the Belle Vernon warehouse by over $2,000,000.00 a year.[8]

By far the most frequent injury to an assembler is a back injury because of the constant lifting and carrying of heavy car-

tons; back injury accidents result in an average of 46.46 lost workdays per accident at Fox.[9] The injury suffered by each of the employee/plaintiffs was either a twisted, sprained, or broken ankle. After the Crown Pallet Trucks were purchased, back injury rates for assemblers significantly decreased and foot injury rates "were flat" even though an assembler picked significantly more cases during an eight hour shift; foot and ankle injuries among assemblers at Fox were statistically "rare events".[10]

Evidence was presented at the hearings which clearly indicates that the risk of being struck by the Crown Pallet Truck is truly avoidable if the operator simply stays to the side of the Crown Pallet Truck as he had been instructed and does not walk in front of it while he is picking his order.[11] Testimony was presented that there was no need for an assembler to ever be in front of the Crown Pallet Truck he is operating and that during training each employee was instructed to remain at the side of his Pallet Truck, stop when he was beside his pick, release the control handle, and let the Pallet Truck coast by him.[12] Each of the plaintiffs who testified failed to operate the Crown Pallet Truck in the manner they had been instructed in that they each released the control handle a few feet *before* they were beside their pick and then walked ahead of their Pallet Truck while it was coasting.[13]

At the hearings, Defendant presented extensive evidence which indicated that while assemblers had suffered 26 accidents in-

1. *Transcript of hearing commencing on May 1, 1987* ("May 1 Record") at 143.

2. *Id.*

3. *Transcript of hearing commencing on July 10, 1987* ("July 10 Record") at 39.

4. *Id.*

5. *Transcript of hearing commencing on August 5, 1987* ("August 5 Record") at 111.

6. *Transcript of hearing commencing on April 30, 1987* ("April 30 Record") at 175, 178, 185 and 187.

7. *Transcript of hearing commencing on May 5, 1987,* ("May 5 Record") at 130–131; *Transcript*

*of hearing commencing on August 6, 1987* ("August Record") at 209.

8. August 5 Record at 65.

9. *Id.* at 38; July 10 Record at 175.

10. August 6 Record at 198–209; July 10 Record at 211–212.

11. July 10 Record at 23, 26; May 1 Record at 91–93, 151; May 4 Record at 25–27, 69–71, 102–103.

12. July 10 Record at 21–26.

13. April 30 Record at 14–16, 66–69, 101–113, and 156.

volving foot injuries during the three years following the implementation of the Crown Pallet Trucks, the true accident rate was statistically very low because of the tremendous number of work-hours the Pallet Trucks were used during that period by assemblers.[14]

During the years 1982 through 1985, the actual accident rate experienced by Fox was one foot injury per 25,707 assembly man hours worked—the equivalent of only 1 accident for the equivalent of 12.4 work years.[15] It was uncontested at the hearings, however, that in the grocery warehousing industry accident rates significantly increase after the introduction of production standards and that after the "initial shock", accident rates return to normal.[16] The same was true in the Belle Vernon warehouse: Fox experienced a significant increase in the number of accidents in 1983 after implementation of the production standards, but in 1982, 1984 and 1985 (years during which the Crown Pallet Trucks were used) the accident rates for assemblers were far below that which Fox had experienced when assemblers had performed the assembly function using the Barrett ox.[17] The actual accident rate experienced during the first eight months of 1987 by Wetterau Corporation, the parent company of Fox ("Wetterau"), which owns 547 Crown Pallet Trucks throughout its grocery operations, was only 2 accidents during the 1.6 million work-hours that the Crown Pallet Trucks were in use—the equivalent of only 1 accident for the equivalent of 400 work years.[18]

At the hearing, Plaintiff offered the testimony of Professor Terrence Stobbe, who stated that in his opinion the risk of harm inherent in the Crown Pallet Trucks outweighed their utility because the Crown Pallet Trucks could have been alternatively designed with longer handles.[19] He stated longer handles would not adversely affect its utility, but would place the operator further away from the Crown Pallet Truck while walking along side it thus reducing the risk of injury.[20] Mr. Stobbe, however, admitted (i) that the design features of the Crown Pallet Trucks (specifically the coast control device) were a substantial benefit in terms of increasing the productivity of the operator,[21] (ii) that he knew of no alternative product that was as productive,[22] (iii) that he knew of no other manufacturer who produced pallet trucks with longer handles,[23] (iv) did not know whether or not his suggestive alternative was feasible or practicable,[24] and (v) that there was nothing about the design of the Crown Pallet Truck which would make it difficult to operate it while at its side.[25]

The practicability of Professor Stobbe's sugested alternative design was vigorously attacked by each of Defendant's two expert witnesses, Crown's design engineer, Harold Stammen and by Alan Bates, the head of maintenance at Fox.[26] Each of these two witnesses testified that Professor Stobbe's alternative was not practical because it would create serious hazards and risk of injury to the operator when riding the Crown Pallet Truck as longer handles would interfere with the operation of the control arm (the handles are attached perpendicularly from the control arm), the steering and braking mechanism of the pallet truck.[27]

14. August 6 Record at 211–317.

15. *Id.* at 255.

16. August 5 Record at 81, 102–105.

17. August 6 Record at 211–317; July 10 Record at 168–169.

18. August 5 Record at 75.

19. May 1 Record at 45.

20. *Id.* at 52.

21. *Id.* at 103–106.

22. *Id.* at 130.

23. *Id.* at 107.

24. *Id.* at 111.

25. *Id.* at 90–92.

26. May 1 Record at 156; May 4 Record at 30–35, 75–85, 100–101.

27. May 1 Record at 156–157; May 4 Record at 30–34, 75, 81–85, 100–101.

At the hearings, neither Professor Stobbe nor any other witness offered any testimony which would tend to show that the risks of injury that could be caused by the other alleged design defects of the pallet trucks outweighed the utility of such features [28] nor did plaintiffs present any evidence with respect to the risk or utility of an automated conveyor, an alternative method of assembling groceries. On the other hand, defendant presented substantial evidence showing (i) the utility of such design features,[29] (ii) the risks that the operator would be exposed to if plaintiff's alternatives had been incorporated into the design,[30] (iii) the impracticability of a different design,[31] and (iv) the adverse effects the implementation of plaintiffs' alternatives would have on the operation of the pallet truck and for the operator.[32]

Although plaintiffs submitted essentially no evidence on three of the four features of the pallet trucks which were alleged to constitute design defects, defendant presented competent and highly persuasive evidence to support its position with respect to those alleged design defects. In addition, defendant submitted extensive negative evidence concerning the risk-utility of the alternative "product," an automated conveyor system which can be used to perform a similar function.

### 1. *Longer Handles*

Although Professor Stobbe gave his opinion that longer handles would have reduced the risk of injury to a walking operator and would not have interfered with the utility of the Crown Pallet Truck, it was readily apparent that he had overlooked one critical fact—that the Crown Pallet Truck is also ridden by an operator, and that longer handles would significantly interfere with the operator's ability to steer and brake the pallet truck when riding it. Al Bates, the head of equipment maintenance at Fox and an independent witness, testified that he didn't think extending the handles two inches "was practical" because "as soon as you go on the machine to take the groceries to the dock ... and if you wanted to make a turn ... you couldn't make that turn because the steering arm would hit you in the side or the chest.[33]

Professor Romualdi, one of Crown's expert witnesses, echoed Mr. Bates concerns and explained that the Crown Pallet Truck must be a "very narrow machine" if it is to function in the aisles of a grocery warehouse, and that, if the handles were longer, when an operator is in the riding position, he would be unable to "raise and operate the handle." [34]

Ziggie Thomas, another Crown expert witness, emphasized another hazard to the operator which would be experienced if the handles were longer; because the handles are attached to the control arm, if the operator were making a turn away from his body, longer handles would extend beyond the sides of the Crown Pallet Truck increasing the risk of striking a rack or other object which could cause the operator to be thrown from the equipment and would otherwise interfere with the operation of the Crown Pallet Truck in "tight corners." [35]

Harold Stammen, Crown's Manager of New Product Design, stated that as presently designed the "handle comes very close to the operator" when he is standing on the riding platform and if the handles were longer it would impair the operator's ability to brake the Crown Pallet Truck.[36]

---

**28.** The other features originally claimed by plaintiffs to constitute design defects were: (i) the coast control device; (ii) the height of the platform from the floor; and (iii) the absence of a rubber "guard".

**29.** See footnotes 49 through 81 and textual discussion.

**30.** *Id.*

**31.** *Id.*

**32.** *Id.*

**33.** May 1 Record at 156–157.

**34.** May 4 Record at 30–34.

**35.** *Id.* at 75, 81–85.

**36.** *Id.* at 100–101.

Furthermore, on cross-examination, Professor Stobbe admitted that he could not state that the pallet trucks could be operated "safely and functionally" with longer handles because "the only way I would be able to state that would be to demonstrate" it and he had never seen or performed such a demonstration.[37]

### 2. Lowered Platform

The plaintiffs offered no evidence on the risk or utility of a lowered platform. Professor Romauldi, however, testified that lowering the platform (i) would not reduce a stress injury to the ankle if an operator were struck by the pallet truck,[38] and (ii) would present a greater hazard to the operator because "there is a significant amount of debris, as found in any warehouse, two-by-fours and so on, and ... [could] get under the machine and cause it to jolt".[39] Ziggie Thomas testified that a lower platform would increase the risk of injury to an operator's toes when facing the pallet truck.[40]

Theodore McGovern, Wetterau's Vice–President of Warehousing and Transportation, stated that an important safety consideration for Wetterau was whether a pallet truck had enough "lift height to be able to back into a truck without getting hung up."[41] In addition, Mr. Bates testified that at the time of the decision to purchase the pallet trucks, "the Company was anticipating that after picking the order ... [the operator] would be able to back in onto the truck".[42]

### 3. Addition of a Rubber Guard

Professor Stobbe gave no testimony related to the utility or risks of the addition of a rubber guard to the front of the Crown Pallet Truck although he admitted that a pallet truck with or without a rubber guard "doesn't make a whole lot of difference".[43] Professor Romauldi stated that a rubber guard will not prevent injuries because being made of rubber it is flexible and will flex back on impact—the operator would still suffer the force of the impact with the moving—pallet truck.[44] He opined that the rubber guard created a hazard because it could catch the front of the foot and prevent it from being brought out quickly.[45] Ziggie Thomas stated that the addition of a rubber guard would not prevent accidents.[46]

### 4. The Coast Control Device

At a status conference held when these cases were first filed, the plaintiffs identified the coast control device as the design feature which they alleged to be the design defect. But as discovery progressed, it became apparent that this theory would not be a successful one, as amply demonstrated by the evidence presented at the hearings. Not a single witness testified to anything other than the tremendous benefits obtained from operating the Crown Pallet Truck with the coast control device in its operational position.

Don Podwicka, the Fox employee, in charge of training employees on the use of the Crown Pallet Truck, referred to the coast control device as an "asset" because "you could pick your cases without carrying your cases."[47] During training he pointed out to the operators that use of the coast control device was optional but "showed them the advantages of using the coast control device".[48] He characterized the coast control device as a "safety factor" because when it is used the "equipment does not stop dead and possibly throw

---

**37.** May 1 Record at 110–112.

**38.** *Id.* at 47.

**39.** *Id.* at 47.

**40.** *Id.* at 85–91.

**41.** August 5 Record at 44.

**42.** May 1 Record at 153.

**43.** May 1 Record at 76.

**44.** May 4 Record at 14.

**45.** *Id.*

**46.** *Id.* at 74.

**47.** July 10 Record at 24–25.

**48.** *Id.* at 29–30.

[an operator] from the [pallet truck] or the product on top of the individual or possibly even damage the product".[49] During training he "stressed deeply the problems that [the operators] would have if they didn't [use the coast control device]".[50]

Doreen Coulson (formerly Kapfer) one of the plaintiffs, indicated that the coast control device was a very important feature to her because she wanted the pallet truck to coast to a gradual stop so her load would not shift.[51] William Baker testified that he could pick more cartons in an eight hour shift using the coast control device because he could save several steps on each pick.[52] Professor Romauldi, using a conservative estimate of 500 picks a shift, estimated the use of the coast control device would save an operator from walking ⅗ of a mile a shift.[53]

Not one piece of negative testimony with respect to the coast control device was given at trial. The benefits of the Coast control device were strikingly illustrated by the testimony of two of the plaintiffs, Elaine Grinarml and William Baker. These two plaintiffs had each suffered more than 1 accident while using the Crown Pallet Trucks—Grinarml had 3 accidents and Baker had 2. Notwithstanding the fact that each had been previously injured while using the Crown Pallet Truck and each knew they could set the coast control device to be non-operational, they had chosen to continue using the coast control device. At the time of their last accident each had the coast control device in its operational position. Obviously, they each viewed the benefits as outweighing the risks of injury in their decision to continue to use the coast control device even after they had been previously injured. It is Crown's position

that each plaintiff chose to use the coast control device because its many beneficial aspects outweighed any risk of injury.

### 5. A Conveyor System: An Alternate Product

Because of the testimony of Adam Vlanich,[54] an employee of Fox this Court at the hearings indicated that pallet trucks perhaps were "obsolete" and had "no utility" because conveyor systems, an alternative method of transporting groceries in grocery warehouses, were more "productive". Defendant's counsel strenuously objected to this characterization in light of the fact that Mr. Vlanich had also testified that Giant Eagle conveyor system cost $31,000,-000 and that Fox was not in a position to have made that kind of an investment in new equipment.[55] The Court, however, warned defendant's counsel that Mr. Vlanich was not competent to testify as to the cost of a conveyor system and that unless defendant could present evidence to show that there were greater risks associated with the use of conveyor systems, he would resolve the risk-utility in favor of the plaintiffs.[56]

In response to this Court's warning, defendant called Theodore McGovern, Vice-President of Warehousing and Transportation for Fox's parent company, as a witness as to the use of conveyors in grocery warehouses. Mr. McGovern has the responsibility of making all equipment purchasing decisions for Wetterau's twenty-three distribution centers, some of which are equipped with Crown Pallet Trucks and some of which are equipped with a combination of conveyors and Crown Pallet Trucks.[57] He explained that conveyors will never totally eliminate the need for pallet

49. *Id.* at 30.

50. *Id.*

51. April 30 Record at 129–130.

52. *Id.* at 74–75.

53. May 4 Record at 19–23.

54. Mr. Vlanich testified that two employees (one to put a case on the conveyor and one to take it

off) can assemble 600 cases an hour using a conveyor system, a rate of 300 cases per hour per employee and that one Fox employee using a Crown Pallet Truck could only pick as high as 193 cases an hour per employee. *Transcript of hearing commencing on May 5, 1987* ("May 5 Record") at 130–133.

55. *Id.* at 145.

56. July 10 Record at 39–49, 70–112.

57. August 5 Record at 4–5, 8–9.

trucks in the industry because many grocery items are simply not conveyable—many items are toxic (bleach, ammonia, lye, etc.) and there are safety hazards presented by the automatic conveyance of such items.[58] To determine whether installation of a conveyor would be efficient for a particular warehouse, he testified it was necessary to look at the warehouse's customer base—if orders are coming from many small stores at different times and which require delivery on short notice, a conveyor system will not be cost effective. He indicated warehouse conveyor systems are much more expensive to install and that most grocery operations can't get the necessary return on the initial investment needed to justify the installation of such a system.[59]

He also noted there were other problems inherent with conveyor systems: (i) if there is a maintenance problem, the entire conveyor system must be shut down and no groceries can be assembled or shipped during that time (no such problem is created by the breakdown of one pallet truck)[60]; (ii) conveyors depend on computers to run them and he is aware of at least one situation where the computer was incapable of making the conveyor system operations[61]; (iii) installation of a conveyor requires a building with 35 foot ceilings—the ceilings at the Belle Vernon are only 20 feet high;[62] (iv) the "turn around time" once a warehouse receives an order until the order is delivered is 24–48 hours with a conveyor—

with pallet trucks the turn around time is only 5–6 hours[63]; and (v) in a disaster, because pallet trucks are battery operated, groceries can still be shipped—with conveyors they can't.[64]

Moreover, he indicated that conveyors pose the risk of *serious* injury to assemblers: (i) a conveyor is comprised of sprockets and chain which have "pinch points" in which an employee can lose a hand or toe[65]; (ii) because employees are working on levels three floors high, there is a risk of an employee seriously injuring himself by falling[66]; (iii) because conveyors are electrical equipment, fires and electrical shocks can spread throughout the entire system causing severe burns and death[67]; and (iv) the risk of product falling from the conveyor onto an employee standing three floors below.[68]

Plaintiffs' evidence related to these safety aspects of the pallet truck consisted of the testimony of four of the plaintiffs who suffered foot or ankle injuries when they placed themselves in front of a pallet truck they knew to be moving.

In order to evaluate the actual risk of injury at Fox and the seriousness of those injuries, defendant offered the testimony of Dr. Sharon Zucconi, an epidemiologist[69] who had performed a statistical study of all accidents occurring in the Fox warehouse during the years of 1979 through 1985.[70]

During the period from 1979 through 1985, the incidence of foot injury accidents

**58.** *Id.* at 11.

**59.** *Id.* at 62.

**60.** *Id.* at 69.

**61.** *Id.*

**62.** *Id.* at 73.

**63.** *Id.* at 74.

**64.** *Id.* at 60–62.

**65.** *Id.* at 58.

**66.** *Id.*

**67.** *Id.* at 79.

**68.** *Id.* at 59.

**69.** Epidemiology is a science which studies and evaluates the incidence, distribution and control of diseases and injuries in a population group. July 10 Record at 115. Defendant had previously attempted to introduce Fox's OSHA records for the years 1979–1985 to show the reduction of accident rates and lost work days after the purchase of the pallet trucks, but the Court rules the defendant would have to produce such testimony from a statistician. May 4 Record at 43–52.

**70.** The years 1979–85 were used for Dr. Zucconi's statistical survey because those years represented the three years prior to 1982, the first full year that the pallet trucks were in use at Fox, and the three years following 1982.

at Fox did not change,[71] but the incidence of back injury accidents significantly decreased after implementation of the pallet trucks.[72] The average number of work days lost per each back injury was 46.46 during this period[73] and the average number of work days lost per each foot injury was 25.74.[74]

Dr. Zucconi characterized the occurrence of a pallet truck related foot injury as an "event [which] was so rare" among assemblers compared to back injuries—it was characterized as "rare" because of the high number of assembly man hours worked with the pallet trucks[75]. She determined that the actual injury rate at Fox had been equal to one accident per 12.4 years of assembly work[76].

Crown also presented the testimony of Theodore McGovern, who testified that during the first nine months of 1987, Wetterau experienced only two foot accidents during the 1.6 million work hours that 547 Crown Pallet Trucks were in use in Wetterau's warehousing—the equivalent of only one accident for 400 work years[77].

It is the position of Crown that the Wetterau accident rate reflects a truer accident rate than the accident rate experienced by Fox. It was undisputed at the hearings that accident rates significantly increase in the grocery warehousing industry after the implementation of production standards and that after the "initial shock," those rates return to normal levels[78]. Fox implemented production standards in September 1982[79], and experienced an increase in accident rates in 1983 but in 1982, 1984 and 1985, using the Crown Pallet Trucks, the accident rates for assemblers were far below that which Fox had experienced when the assembly function was performed with the Barrett ox[80].

The plaintiffs' injuries consisted of sprained or broken ankles; none of these injuries were life threatening. The evidence indicated that the risk of back injury among the assemblers was six times more likely an event at Fox than a foot injury and that the average back injury resulted in almost twice as many lost work days than a foot injury.[81]

Crown's evidence showed that the risk of a foot injury, when viewed in the context of the extraordinary high number of total man hours worked using the pallet trucks, was in fact very low, and that when an accident did occur, the resulting injury was not severe.[82] These facts are especially compelling in view of the risks of a back injury (in terms of both the incidence and severity of a back injury) to an assembler and (ii) that back injury rates significantly declined after the introduction of the Crown Pallet Trucks at Fox.

In addition to achieving a significant reduction in the incidence of back injuries among assemblers, the implementation of the Crown Pallet Trucks enabled Fox to achieve the operating efficiencies which allowed it to remain competitive in the grocery warehousing industry. After the Crown Pallet Trucks were put into service, assemblers were able to pick 53% more product during an eight hour shift than they had been picking with the Barrett oxes;[83] and Fox was able to reduce its

---

71. July 10 Record at 153.

72. August 6 Record.

73. July 10 Record at 176.

74. *Id.* at 175.

75. August 6 Record at 254–55.

76. *Id.* at 255.

77. August 5 Record at 75.

78. *Id.* at 81, 102–105.

79. *Id.* at 111.

80. August 6 Record at 211–317, July 10 Record at 168–169.

81. Dr. Zucconi testified that the accident incidence of back injuries among assemblers was the equivalent of one back injury for every 2.08 work years. August 6 Record at 308; July 10 Record at 175.

82. Each foot injury resulted in an average of 25.76 lost work days. July 10 Record at 175.

83. August 6 Record at 209.

assembly costs by over $2,000,000 a year,[84] at total of over $12 million during the past six years. Those savings were passed along to Fox's customers,[85] resulting in lower food costs for the consumer.

Testimony was introduced that Wetterau's average cost an industrial accident is $6,000 per accident;[86] because accident rates significantly declined after the Crown Pallet Trucks were purchased, Fox received a great economic benefit from the reduction of accidents.

The testimony indicated that the Crown Pallet Truck made the assemblers job responsibilities easier to perform by relieving operator fatigue.

At the hearings, plaintiffs offered no credible evidence on risk-utility issues. Defendant, on the other hand, offered the testimony of (i) five employees of Fox; (ii) three expert witnesses (including the testimony of an epidemiologist); (iii) Harold Stammen, Crown's Vice–President of New Product Design; and (iv) Theodore McGovern, Wetterau's Vice–President of Warehousing and Transportation (who was ruled by the Court to be an expert on safety). Several times during the hearings, the Court strongly encouraged plaintiffs to bring in other witnesses.[87] Plaintiffs did not, despite the Court's warnings, offer any other witnesses.

Under these circumstances, plaintiffs' failure to call additional witnesses supporting their position requires that the Court draw an adverse inference that the testimony of those witnesses would have been unfavorable to plaintiffs. *SEC v. Scott*, 565 F.Supp. 1513, aff'd, 734 F.2d 118 (2d Cir.1984); *McElroy v. Cessna Aircraft Co.*, 506 F.Supp. 1211 (W.D. Pa.1981).

At the hearings in the cases now before this Court, plaintiffs offered proof of one "alternative design" (longer handles) and one "alternative product" (a conveyor system). With respect to the alternative design, plaintiffs' expert essentially opined that if the pallet truck had longer handles it would be safer than as designed. Said expert did not offer any evidence as to the effect the alternative design would have on the safety of the pallet trucks in other respects. Nor did he opine that longer handles would have prevented the plaintiffs' injuries.

It appeared that Professor Stobbe had not taken into consideration all factors relevant to a risk-utility analysis. He had not considered one critical fact—that the Crown Pallet Truck is also ridden by an operator, and that longer handles would have significantly and adversely affected the operator when in a riding position. In addition, he had no idea of the accident rate per man hours worked on the pallet trucks;[88] he did not consider the number of work days lost per accident which is an indication of an accident's severity[89]. He had no specific information on the productivity achievements of the pallet trucks other than admitting that "these machines are very productive machines," and explaining "I mean people are able to do a very high rate of assembly piecework, using these machines[90]". Because Professor Stobbe's opinion cannot be rationally supported by the facts, his opinion is disregarded by the Court. *See Breidor v. Sears, Roebuck & Co.*, 722 F.2d 1134 (3rd Cir.1983).

With respect to the alternative product, no evidence whatsoever was presented by plaintiffs which would show that conveyor systems are safer than the pallet trucks.

**84.** August 5 Record at 65–66.

**85.** *Id.* at 67–68.

**86.** *Id.* at 56.

**87.** In response to the Court's question concerning whether plaintiffs intended to bring in additional witnesses, plaintiffs' counsel replied that while they had other "experts available" they did not anticipate bringing them in. The Court replied: "I can tell you it is going to be neces-

sary. I can tell you, categorically and absolutely, it will be necessary." April 30, Record at 189. *See also*, July 10 Record at 45. After defendants had presented all its witnesses the Court told plaintiffs' counsel, "You're running a terrible risk if you don't put any counter evidence in." August 6 Record at 345.

**88.** May 1 Record at 99–100.

**89.** *Id.* at 100.

**90.** *Id.* at 102–103.

Moreover, the evidence presented by defendant clearly showed that a conveyor system was not an alternative which was "practicable under the circumstances."

Now that this Court has assembled the evidence of the parties relating to the utility, risks and benefits of the pallet trucks in question, *Azzarello, supra,* 480 Pa. at 558, 391 A.2d at 1026, requires this Court to determine whether or not the utility of these pallet trucks outweighs the unavoidable danger or risk of personal injuries in its use.

The Pennsylvania Superior Court in *Dambacher,* cited *supra* identified two formulations of various factors that a trial court may use for its guidance in making the social policy decision required by *Azzarello.* (See lists set forth in this opinion, *supra* )

This trial court is of the opinion that the list of factors approved by the Superior Court in *Dambacher* and formulated by Dean John W. Wade, at pages 837 and 838 of his law review article, *On The Nature Of Strict Tort Liability For Products,* 44 Mississippi Law Journal 825, (1973), are the most appropriate guidance for this trial court to use in making the determination as to whether or not the utility of the pallet truck outweighs the danger inherent in its use.

## ONE: THE USEFULNESS AND DESIRABILITY OF THE PRODUCT—ITS UTILITY TO THE USER AND TO THE PUBLIC AS A WHOLE.

From the evidence adduced at the hearings this trial court is satisfied that Fox Grocery Company (who operated the grocery distribution warehouse and who employed the plaintiff to operate the pallet trucks in question,) the plaintiffs, and the public generally have reaped substantial economic benefits from the use of the pallet trucks. *Fox* is the party which directly received the benefits of the increased productivity achieved by the pallet trucks. *Fox* saved $2,000,000 a year through implementation of pallet trucks and production standards (or $12,000,000 in the six years since the pallet trucks were purchased).

The *plaintiffs,* as well as all other employees at Fox who operate the pallet trucks, also reaped direct benefits. Their job responsibilities were made easier to perform and the risks of back injuries and certain other types of injuries were greatly reduced.

By implementing the pallet trucks, *Fox* has been able to maintain its competitive position in the grocery warehousing industry and has been able to pass its savings onto its customers in the form of lower prices for groceries. Thus, the *public* has directly reaped the benefits of the increased productivity Fox was able to achieve.

The testimony indicated that accident rates go up in the grocery warehousing industry when production standards are implemented. Common sense would indicate that if an employee is required to perform more work in the same amount of time, the risk of injury may be increased. *Fox,* not Defendant Crown, made the decision to implement production standards shortly after the purchase of the Crown Pallet Trucks.

*Fox* encouraged its employees to use the coast control device because of the increased productivity it could achieve. The *employees* chose to use it because it made their job easier and safer. Defendant Crown did not force Fox or the employees to accept the benefits inherent in this feature. They chose to use it. This Judge literally begged the plaintiffs to submit expert evidence on this issue, but the plaintiffs refused to do so.

This trial court finds as a fact that the pallet trucks are very useful, economically and socially desirable to the plaintiffs, the purchaser (Fox) and to the public as a whole.

## TWO: THE SAFETY ASPECTS OF THE PRODUCT—THE LIKELIHOOD THAT IT WILL CAUSE INJURY AND THE PROBABLE SERIOUSNESS OF THE INJURY.

The fact that a pallet truck moves is an inherent characteristic which, by necessity

involves a certain level of *unavoidable* risk.

There are some products which, in the present state of human knowledge are quite incapable of being made completely safe for their intended and ordinary use.... The seller of such products...., is not to be held to strict liability for unfortunate consequences in its use, merely because he has undertaken to supply the product with an apparently useful and desirable product, attendant with a known but apparently reasonable risk.

It has been stated over and over by the Pennsylvania Courts that a product is not defective simply because accidents may occur during its use. *E.g. Berkebile v. Brantly Helicopter Corp.*, 462 Pa. 83, 337 A.2d 893 (1975) (A knife cannot be found defective merely because it cuts; its utility outweighs the risk involved in normal use.); *Pegg v. General Motors Corp.*, 258 Pa.Super. 59, 391 A.2d 1074 (1978) ("It is important to distinguish a product that is defective from a product that is inherently dangerous ... whether a product is inherently dangerous is a function of the extent to which the dangers are technologically unavoidable and the public need for the product great").

Defendant offered statistical evidence (which is heretofore discussed in this opinion) that the actual injury rate at Fox was one accident per 12.4 years of assembly work, and Fox's successor company, Wetterau experienced only two foot and leg accidents during the 1.6 million work hours that 547 Crown Pallet Trucks were in use in grocery warehousing, which was equivalent of only one accident for 400 work years.

The evidence presented by defendant showed that practically all of the accidents in question were foot and leg accidents and none of said accidents were life threatening.

Here again, although requested to do so, the plaintiff offered no evidence on this factor.

As to this second factor, this Court finds that the relative chances that the product will cause injury compared to the many work years of injury free use, along with the fact that the injuries sustained are not life threatening, causes this Court to weigh this part of the social policy consideration against the finding that the product in question is "unreasonably dangerous".

THREE: THE AVAILABILITY OF A SUBSTITUTE PRODUCT WHICH WOULD MEET THE SAME NEED AND NOT BE AS UNSAFE.

The question of whether a safer substitute product was available was raised by the Court and was addressed by the defendant. Again, the plaintiff refused to present evidence on the subject, although requested to do so.

The evidence presented by defendant as to the relative utility of a conveyor system, (the only product which has been suggested to this Court as an alternative to the use of pallet trucks in assembling groceries in a warehouse for distribution to super market stores) has been heretofore discussed in this opinion.

This Court concludes after a careful consideration of the evidence presented, that the conveyor system because of logistical and financial problems encountered in its potential installation; maintenance problems after installation; and greater risks of more numerous and serious injuries including death; that there is no product presently available that can be properly installed in the user's warehouse facility that will be as safe as the pallet truck and will meet the need of the user to assemble groceries as well as the defendant's pallet trucks. Again social policy and economic considerations in the consideration of the third factor weigh heavily in favor of the Defendant Crown.

FOURTH: THE MANUFACTURER'S ABILITY TO ELIMINATE THE UNSAFE CHARACTER OF THE PRODUCT WITHOUT IMPAIRING ITS USEFULNESS ON MAKING IT TOO EXPENSIVE TO MAINTAIN ITS UTILITY.

This factor is the only one of Dean Wade's seven suggested factors which this

Court should consider in making the economic and social policy decisions required by *Azzarello,* that was addressed by the plaintiff with expert opinion evidence. The defendant also presented expert opinion evidence on this issue.

Earlier on in this opinion, this Court discussed the expert opinion evidence offered on the subject of using longer steering handles, lowering the truck platform, adding rubber guards, and redesigning the coast control device on the pallet trucks as a means of eliminating the unsafe character of said pallet trucks.

This Court concludes after a careful analysis of all of the expert testimony given and after an "on site" view of the pallet trucks in operation that none of the suggested changes of the pallet truck would eliminate any alleged unsafe character of the pallet truck, but to the contrary, installation of longer handles in fact would cause the pallet truck to be much more unsafe than is presently the case.

This Court finds that by a preponderance of evidence from the defendant's evidence presented that lowering of the platform of the pallet truck, adding a rubber guard or redesigning the coast control, would not in any way improve the safety of said truck. On the other hand, the plaintiff offered no evidence of any kind on the risk, safety, and/or utility of lowered platforms, installing rubber guards, or redesigning the coast control of said pallet truck.

Here again, as to the consideration of this fourth factor, social policy and economic considerations weigh heavily against a finding by this Court that the Crown Pallet Truck in these cases was unreasonably dangerous.

NOTE: The confusion in this case as to where the burden of proof lies when this Court is deciding the threshold questions of "unreasonably dangerous"—"risk utility" and "social economic policy" prior to presenting any evidence to a jury, is academic in this case, since the defendant proved by a fair preponderance of the evidence that the manufacturer did not have the ability to make the product more safe than

what it is at the present. The plaintiff was invited to rebut the defendant's evidence in whole or in part, but completely failed to do so. *See dicta in Hollinger v. Wagner Mining Equipment Co.,* 667 F.2d 402, at 409 (3d Cir.1981) compare *Huddell v. Levin* 537 F.2d 726, 736 (3d Cir.1976) interpreting New Jersey law of strict liability; *Jeng v. Witters* applied New Jersey law as an interpretation of Pennsylvania law. 452 F.Supp. 1349, *affirmed,* 591 F.2d 1335 (3d Cir.1979) compare *Dambacher* approved by the Pennsylvania Supreme Court, cited *supra* which cites with approval the California case of *Barker v. Lull Engineering Co.,* cited *supra,* whereas California Courts place the burden of proof as to the seven factors involved in the pre-jury trial risk-utility analysis on the defendant, once the plaintiffs have made a *prima facie* showing that the alleged injury was proximately caused by product's design. However, the ultimate burden of proving a defective product and the existence of an alternate safe design is on the plaintiff, if the trial judge finds that the product is "unreasonably dangerous" and allows the plaintiff to submit evidence to the jury after a risk-utility analysis based on a factual hearing record and *not* on the bare allegations in the plaintiffs' complaint. *See Ellis v. Chicago Bridge and Iron Co.,* 376 Pa.Super. 220, 545 A.2d 906, 914, 915 (1988) *Hon v. Stroh Brewery Co.* 835 F.2d 510, 512 (3d Cir.1987).

FIFTH: THE USER'S ABILITY TO AVOID DANGER BY THE EXERCISE OF CARE IN THE USE OF THE PRODUCT.

There is no doubt that the plaintiff-users of the pallet truck could have avoided the danger that brought about their injuries.

Each plaintiff was struck by the front corner in front of the pallet truck while it was moving forward and each plaintiff was the operator and it was each plaintiff operator who controlled where he placed him-

self in relationship to the moving pallet truck. Each *plaintiff* ignored the instructions given by his employer. Each *plaintiff* put himself in a position of obvious danger and the evidence conclusively indicated there was absolutely no reason for an operator to ever place himself in front of a moving pallet truck. In addition, each plaintiff received full workmen's compensation benefits [91]—these injuries were not, thus of a type for which the plaintiffs were not insured, and therefore, not protected.

The evidence presented by Defendant Crown at the hearings clearly established that there are *no risks* involved in the use of the pallet trucks *if* an operator stays at its side. Therefore, the benefits clearly outweighed the risks involved in the use of the Crown Pallet Truck because the risks can be controlled by common sense in its operation—simply do not step in the path of the pallet truck when it is moving.

SIXTH: THE USER'S ANTICIPATED AWARENESS OF THE DANGERS INHERENT IN THE PRODUCT AND THEIR AVOIDABILITY, BECAUSE OF GENERAL PUBLIC KNOWLEDGE OF THE OBVIOUS CONDITION OF THE PRODUCT, OR OF THE EXISTENCE OF SUITABLE WARNINGS OR INSTRUCTION.

It is common knowledge that any motorized vehicle such as the pallet truck or automobiles, certain drug products and various other products in use today carry significant risks to the user. An automobile is not unreasonably dangerous simply because it is designed to travel at speeds in excess of 55 miles per hour. Indeed, it cannot be denied that an automobile would no doubt be safer (and thousands of lives would be saved each year) if it were designed to travel only at speeds less than 10 miles per hour. Society accepts the additional dangers created by an automobile's speed capabilities because of the corresponding benefits inherent therein. Neither the general public, the plaintiffs, or a judge and a jury would need evidence as to the benefits inherent in an automobile's speed capabilities to determine that an automobile is not unreasonably dangerous or defective because of its speed.

Similarly the general public knows beyond doubt that material handling equipment is not "unreasonably dangerous" merely because it may run into and damage people and/or other physical objects when it is allowed to coast along the aisle of a grocery warehouse without being steered or otherwise controlled.

The plaintiff-operator allowed the pallet truck to coast without said operator in control (an undeniable utilitarian feature) and each injured plaintiff walked in front of said pallet truck when he/she knew and/or should have known that the pallet truck was coasting in the direction of said plaintiff immediately before the accident in question in total disregard of the instructions he had been given and in disregard of common sense. If a pedestrian steps in front of a moving automobile, no court could be fooled into accepting a claim that the car was unreasonably dangerous or defective simply because the pedestrian is injured (or for that matter, by the fact that 500 pedestrians were injured under similar circumstances).

It is also common knowledge by users and the public generally that pallet trucks, because they are motorized vehicles which move, may be involved in accidents no matter what features are incorporated in their design.

The plaintiff-user is aware of the physical dangers to one's person inherent in allowing an unattended motorized vehicle (the pallet trucks) to coast in a relatively narrow aisle in a direction where the plaintiff-user is standing, thereby causing accidents which are "technologically unavoidable", the "pallet truck" in question is not "unreasonably dangerous" or "defective" in the manner in which it was manufactured. The danger is created by the plaintiff-user when the unattended pallet truck is allowed to coast in a narrow aisle in the grocery warehouse in and about where the

**91.** May 5 Record at 36.

plaintiff-user, who necessarily is aware of the danger, is standing.

SEVEN: THE FEASIBILITY, ON THE PART OF THE MANUFACTURER OF SPREADING THE LOSS OF SETTING THE PRICE OF THE PRODUCT OR CARRYING LIABILITY INSURANCE.

This Court finds as a matter of sound, social and economic policy, a manufacturer should not have to spread the economic loss caused by the injuries in question by raising the price of the product (the pallet trucks) or by carrying liability insurance when the danger of injuries is caused not by a defective product, but to the contrary, is caused by the plaintiff-users who assume personally the risk of injury by failing to properly attend to said vehicle while walking beside it and/or by allowing an unattended vehicle (the pallet trucks) to coast in and about a narrow aisle in a grocery warehouse at a place where the plaintiff-user is standing with total inattention to the movements of said vehicle and where the plaintiff-user is covered by Workers Compensation insurance if he/she is injured.

## CONCLUSION

The mere fact that there may be inherent dangers when an operating pallet truck is improperly attended and/or unattended in the course of being used, does not mean that it is defective in design or unreasonably dangerous. As many cases have emphasized, the issue which is now resolved is that the dangers inherent in the use of pallet trucks as above-noted, are "technologically unavoidable" and the "public need" for these pallet trucks is great. *See also,* Restatement of Torts (Second) Sec. 402.A, *comment k ("Unavoidably Unsafe Products.")*

Based on this Court's consideration of the seven factors hereinabove discussed, the factual evidence adduced at the hearings and the legal authorities referred to in this opinion, this Court finds as a matter of law that the utility of the pallet trucks manufactured by Defendant Crown, far outweighs the risk of harm involved with

their use. This Court further finds as a fact and as a matter of law that pallet trucks are not "unreasonably dangerous" to the users of the same and at the time of their delivery from the defendant manufacturer, Crown to the user, they were not in a "defective condition" and therefore all of the complaints in the above-captioned cases will be dismissed with prejudice.