**Harry T. MONAHAN, Executor of the Estate of Janice L. Monahan, Deceased, and Harry T. Monahan in his own right**

v.

**The TORO COMPANY.**

Civ. A. No. 92–6843.

United States District Court, E.D. Pennsylvania.

June 30, 1994.

---

Justin J. McCarthy, Exton, PA, for plaintiffs.

Mary P. Fritz, William Manning, Minneapolis, MN, for defendant.

## MEMORANDUM AND ORDER

DITTER, District Judge.

This case involves a tragic, fatal accident in which a lawn tractor overturned and the plaintiff's wife was killed. The defendant, the Toro Company, moved for summary judgment, asserting that the lawn tractor at issue in this case was not unreasonably dangerous as a matter of law and that Toro was not negligent with respect to the tractor's design or safety warnings. I heard oral argument on the motion. For the reasons set forth below, defendant's motion is being granted.

## I. FACTS

On May 19, 1992, Janice Monahan ("Mrs. Monahan") was mowing the lawn of the Monahan family home using a Wheelhorse [1] Model 416–8 garden tractor. The tractor overturned and landed upside down on Mrs. Monahan, who died as a result of mechanical asphyxiation due to compression of her chest. Consultants determined that the tractor had been moving down a slope in reverse when the rollover occurred.

The tractor was manufactured by Wheelhorse Products, Inc. ("Wheelhorse") in 1988. The tractor is powered by a 16 horsepower engine and has a 48–inch mower deck. It is offered only in two-wheel drive. The weight of the mower is disputed. Toro claims that the tractor weighs about 670 pounds with the mower deck, while plaintiff claims that the weight of the tractor is 740 pounds.[2] The Model 416–8 lawn tractor is not equipped with a Roll Over Protection System ("ROPS"); the significance of Toro's

---

1. The lawn tractor was manufactured by Wheelhorse Products, Inc. By stipulation, Toro was substituted as the defendant in this case.

2. For the purposes of this opinion, I will accept plaintiff's measure of the tractor's weight.

failure to provide a ROPS is a major point of contention in this lawsuit.

Plaintiff filed suit against Toro, alleging negligence, strict liability, and breach of warranty. Toro's negligence, Mr. Monahan claims, consists of failing to design and install a sufficiently safe braking system; failing to design a sufficiently stable lawn tractor; failing to equip the tractor with a ROPS; and failing to warn Mrs. Monahan adequately of the risks involved in operating the tractor. Plaintiff's strict liability claim rests on the ground that the tractor was defective for these reasons. The breach of warranty claim alleges that the tractor was not merchantable and not fit for its ordinary, intended use.

Toro moved for summary judgment, claiming both that its tractor was not unreasonably dangerous as a matter of law, and that it was not negligent with regard to either the tractor's design or warnings. Summary judgment is appropriate because, where there are disputed issues of material fact, I have accepted plaintiff's version of them. Neither side disputes that Pennsylvania law governs this case.

## II. DEFENDANT'S MOTION FOR SUMMARY JUDGMENT: WAS THE LAWN TRACTOR "UNREASONABLY DANGEROUS"?

Pennsylvania has adopted Section 402A of the Restatement (Second) of Torts. *Webb v. Zern*, 422 Pa. 424, 220 A.2d 853 (1966). That section provides, "One who sells any product in a defective condition unreasonably dangerous to the user or consumer ... is subject to liability for physical harm thereby caused to the ultimate user or consumer...." *Griggs v. BIC Corp.*, 981 F.2d 1429, 1431 n. 3 (3d Cir.1992). "Unreasonably dangerous" is not an independent concept under Pennsylvania law. Rather, it represents a judicial determination that, as a matter of policy, the risk of loss should be placed on the supplier of a product. *Id.* at 1432 n. 4, 1433 (citation omitted). State law is clear that the court, not the jury, decides the threshold question of whether a product is "unreasonably dangerous." *Azzarello v. Black Bros. Co., Inc.*, 480 Pa. 547, 391 A.2d 1020, 1026 (1978). If the court determines

that the risk of loss should be placed on the manufacturer, the factfinder then decides whether the product was sold in a defective condition as alleged. *Id.* 391 A.2d at 1025–26. Thus, unless the trial court resolves the issue of "unreasonably dangerous" in the plaintiff's favor, the issue of defectiveness is not submitted to the jury. *Shetterly v. Crown Controls Corp.*, 719 F.Supp. 385, 389 (W.D.Pa.1989), *aff'd*, 898 F.2d 142 (3d Cir. 1990). The court determines unreasonable dangerousness using a risk-utility analysis. *Id.* at 389; *Jordon by Jordon v. K–Mart Corp.*, 417 Pa.Super. 186, 611 A.2d 1328, 1330 (1992).

State and federal courts have adopted seven factors which a trial judge should consider in analyzing whether a product is unreasonably dangerous. *Shetterly*, 719 F.Supp. at 387; *Dambacher by Dambacher v. Mallis*, 336 Pa.Super. 22, 485 A.2d 408, 423 n. 5 (1984). The seven factors are: (1) the usefulness and desirability of the product to the user and the public as a whole; (2) safety aspects, meaning the likelihood of injury and the probable seriousness of injury; (3) the availability of a substitute meeting the same need without being as unsafe; (4) the manufacturer's ability to eliminate the unsafe characteristic of the product without impairing usefulness or raising the cost; (5) the user's ability to avoid the danger by exercising care; (6) the user's anticipated awareness of the product's inherent dangers and their avoidability, either because of general public knowledge or the existence of suitable warnings; and (7) the feasibility on the part of the manufacturer of spreading the loss by higher product cost or insurance. *Shetterly*, 719 F.Supp. at 387 (citing John W. Wade, "On the Nature of Strict Tort Liability for Products," 44 Miss.L.J. 825, 837–38 (1973)). The burden of proof as to these seven factors is on the defendant, although the ultimate burden of proving a defective product at trial is, of course, on the plaintiff. *Id.* at 401. I will discuss the Model 416–8 in the context of these seven factors.

### A. Usefulness and Desirability of the Product

There is no doubt that riding lawn tractors are useful and desirable to the pub-

lic. They enable an operator to mow a large area in a shorter time and with less fatigue than with a walk-behind mower. Someone who is less physically able can use a riding mower even if he or she might not be able to operate a walk-behind mower. With the large variety of manufacturers and models to choose from, consumers from the suburban homeowner to the groundskeeper of a commercial golf course can find a tractor suitable for his or her needs. Plaintiff does not dispute that lawn tractors are socially useful and desirable. For instance, Sean Monahan stated that one of the reasons the family purchased the Toro (then Wheelhorse) tractor was because it was larger than the previous mower they had used and could mow their lawn in less time. (Sean Monahan Dep. at 42–43). I conclude that lawn tractors are socially useful, desirable, and perform an important function.

### B. Safety Aspects

▇ The next factor to consider is the likelihood of injury and the probable seriousness of injury. That some injuries may occur does not mean that a lawn tractor is defective. *See Shetterly,* 719 F.Supp. at 400. The Consumer Product Safety Commission ("CPSC") estimates that an average of 19,100 injuries per year involving riding mowers required emergency room treatment, and an estimated 7.65 million riding mowers per year were in use during the four years under CPSC study. This implies, according to the CPSC, that 2.5 out of every 1000 ride-on mowers were associated with an injury that required treatment in an emergency room.[3] (Def.'s Reply to Pl.'s Mem. in Opp'n to Def.'s Mot. for Summ.J., Ex. D). The CPSC reported 75 deaths per year in the four-year period studied.[4] This means that one death occurred for every 102,000 riding mowers in operation.[5] I find that the likelihood of the most serious injury—death—is low: these statistics show that the risk of injury from tractor mowers is slight and that the risk of death from "tipping/sliding" is .00049 percent.[6]

### C. Availability of a Substitute

The next *Shetterly* factor to consider is the availability of a substitute product meeting the same need as the riding mower without being as unsafe. A walk-behind lawnmower may arguably be safer than a riding mower in some ways (though arguably more dangerous in other ways), but does not address the same need—mowing a large area with less labor expended—as a riding mower. Plaintiff has not suggested a substitute product that would meet the need of lawn tractors without being as unsafe and, indeed, does not appear to suggest that lawn tractors are obsolete or have no utility because of alternative products.[7] The fact that there is no substitute product that would fulfill the same consumer needs, but more safely, than a

---

3. Walk-behind mowers, in contrast, had an estimated 1.4 injuries per 1000 mowers.

4. Plaintiff offers anecdotal evidence from the CPSC about lawn tractor accidents. (Pl.'s Mem. in Opp'n to Def.'s Mot. for Summ.J., Ex. T). These incidents are not tabulated or averaged or compared to the number of mowers in use; they are merely brief reports of consumer accidents with garden tractors. The circumstances are generalized and did not always involve rollovers.

5. The CPSC further broke down the deaths by the primary hazard pattern associated with each and found that half of the deaths were associated with tipping/sliding. Thus, only one "tipping/sliding death" occurred for every 204,000 riding mowers in operation. The figures do not provide a breakdown between tipping and sliding, and while the meaning of the former may be apparent, I do not know exactly how a mower that slides but does not tip would cause death.

6. This figure becomes even more minute when considering the number of times each mower is used per year. If the mowing season extends from May 1 to October 1, and a lawn is mowed once a week, the mower is used an estimated 20 times per year. The risk of fatal injury from tipping/sliding, then, would be an estimated .0000245 percent.

7. Plaintiff vigorously argues, however, that equipping lawn tractors such as the Toro model 416–8 with rollover protection devices would make the products safer without impairing utility. I will consider plaintiff's position, and defendant's strenuous objections to it, in discussion of the next factor, as plaintiff's argument is not so much about substituting another product for the lawn tractor, but about making the same product safer. *See Shetterly,* 719 F.Supp. at 400 (court considers conveyor system as substitute for pallet trucks).

lawn tractor, is further evidence of its utility and that it is not unreasonably dangerous.

**D. Manufacturer's Ability to Eliminate Unsafe Character of Product Without Impairing Usefulness or Making it Too Expensive to Be Useful**

This factor is essentially the crux of plaintiff's argument and the greatest point of contention between the parties. Plaintiff argues that defendant should have eliminated what he labels as the tractor's unsafe character by using a ROPS on the tractor model at issue, by using a different braking system, by making the tractor more stable, and by implementing a slope-indicator device.

**1. Roll Over Protection System ("ROPS")**

Plaintiff argues that Toro should have equipped the Model 416–8 with a ROPS, and that a ROPS would make the tractor safer without impairing its usefulness or increasing the cost beyond its utility. Toro argues that a ROPS is not without its own dangers, and that on a lawn tractor with the weight, traction capability, and use as the Model 416–8, a ROPS makes the tractor less safe, less useful, or both.

A ROPS is comprised of both a rollbar and a seatbelt. In the event of a tractor rollover, the rollbar limits the roll to ninety degrees. The seatbelt keeps the tractor operator in the seat, preventing him or her from being thrown off the tractor, and possibly pinned beneath the rollbar.

Monahan offered expert testimony that he claims shows that a ROPS eliminates a lawn tractor's unsafe characteristics without diminishing its utility. Mr. J.B. Sevart, a consulting engineer, constructed and tested a ROPS on the Monahans' tractor. (Pl.'s Mem. in Opp'n to Def.'s Mot. for Summ.J., Ex. P). The ROPS raised the center of gravity of the machine by one and one-half inches. Sevart examined the tractor with the installed ROPS going under both a flexible and a rigid obstruction. For the former test, he ran the tractor under a clothesline and found that the line was deflected over the top of the rollbar while the tractor passed safely underneath. (*Id.* at 3). For the latter test, Sevart ran the tractor under a fixed steel bar and observed that "the front wheels of the lawn tractor lifted off the ground," returning to the ground only after the rollbar had passed under the beam. (*Id.*).

Much of plaintiff's evidence consists of articles and technical papers discussing tractor safety, as well as sales brochures and catalogues of tractor manufacturers. (Pl.'s Mem. in Opp'n to Def.'s Mot. for Summ.J., Ex. P, Q, S, U, W, X; Sevart Aff.). Plaintiff refers to these exhibits—which either assert the value of a ROPS or indicate that a ROPS is offered on other manufacturers' tractors—to rebut Toro's contention that a ROPS makes small tractors less safe. There are three faulty premises to plaintiff's argument about these exhibits.

First, it does not follow that, just because some manufacturers use a ROPS on some of their tractors, those manufacturers are correct in, presumably, believing that a ROPS is safer than no ROPS, and that Toro is incorrect. Second, even if it did follow that Toro is wrong and all the other manufacturers are right, it is inconsistent with a strict liability analysis to consider what is or is not standard practice in an industry. *Holloway v. J.B. Sys., Ltd.,* 609 F.2d 1069, 1073 (3d Cir. 1979) (industry standards go to negligence concept of reasonable care and have no place in strict liability action); *Lewis v. Coffing Hoist Div., Duff–Norton,* 515 Pa. 334, 528 A.2d 590, 594 (1987) (same, finds *Holloway* is correct interpretation of state law). Third, plaintiff's exhibits address machines that differ significantly from defendant's tractor at issue in this case. For example, plaintiff offers articles and technical papers that discuss farm and industrial tractors, (Pl.'s Mem. in Opp'n to Def.'s Mot. for Summ.J., Ex. P), tractors varying from 970 to 3400 pounds, (*Id.,* Ex. S), front-end loaders and bulldozers, (*Id.,* Ex. U), and farm, forestry, and earthmoving machines (Sevart Aff.). The exhibits referring to products of other manufacturers, when studied beyond merely the cover photograph to the entire brochure, show that the machines offered therein weigh significantly more than the defendant's tractor, have greater horsepower, or are offered in four-wheel drive. (*Compare, e.g.,* Pl.'s Mem. in Opp'n to Def.'s Mot. for Summ.J., Ex. W

*with* Def.'s Reply to Pl.'s Mem. in Opp'n to Def.'s Mot. for Summ.J., Ex. E). Similarly, plaintiff refers to Honda tractors that have a ROPS, yet each model listed weighs more than the Toro 416–8 and is compatible with front and rear attachments, such as a front loader, tillers, and blades, which the defendant's tractor is not. (Pl.'s Suppl.Mem., Ex. A). Although the reliability of these exhibits is accepted, they deal with machines so unlike the Model 416–8 that they do not support plaintiff's contention about the need for a ROPS on that model.

Toro presented evidence to support its argument that a ROPS on the Model 416–8 would make it less safe. Toro asserts that a rollbar raises the center of gravity of a lawn tractor by adding weight up high, which reduces the tractor's stability. Far from contradicting this, plaintiff's expert indicated that his rollbar raised the center of gravity on the Toro machine. Further, Toro said that it had performed tests with a ROPS on the Model 416–8 and that under some circumstances, the tractor had flipped backwards when the rollbar encountered an overhead object. (Def.'s Reply to Sevart Aff., Ex. A). Indeed, even plaintiff's expert stated that the front wheels of the tractor lifted off the ground when the rollbar encountered a rigid obstruction. Further, Toro argues that the seatbelt component of a ROPS prevents the operator from shifting his or her weight in the seat, which on lighter tractors helps to stabilize the tractor. (*Id.*). While a lower center of gravity (even if only slightly lower) and a rider's ability to shift his or her weight to keep the tractor from tipping at all, may have marginal importance so far as operator death is concerned, they can be very important as far as overall safety is concerned. If a tractor is more likely to roll because of a higher center of gravity or the operator's inability to prevent tipping through weight shifting, there is an increased danger to arms, legs, hands, and feet that can be pinned beneath the rollbar (*Id.*), not to mention the dangers posed by objects protruding from the ground that penetrate the supposed "safety envelope" created by the rollbar.

Toro also maintains that, not only does a ROPS not eliminate the unsafe character of a lawn tractor, but it reduces the utility of a tractor like the Model 416–8. A tractor with a ROPS cannot trim as closely to trees, awnings, and clotheslines, for example, because the rollbar interferes with these low overhangs. Defendant acknowledges that some lawn tractors are equipped with a ROPS, but argues convincingly that those tractors have different specifications, and therefore different uses, than the model in question. For the most part, the lawn tractors with ROPS have higher horsepower than the instant model, are heavier, have four-wheel drive, or accommodate attachments. These characteristics suggest a need for a ROPS in ways that the Model 416–8 characteristics do not. A four-wheel drive tractor can climb steeper hills than a two-wheel drive tractor; the steeper grade increases the possibility of a tipover. Likewise, a tractor equipped with lifting or digging apparatus that is raised and lowered in operation is less stable than one that merely cuts grass. A ROPS on the Model 416–8, defendant argues, would reduce its utility and safety without a corresponding benefit such as being able to mow a steeper grade or attach a tool.

Accepting all of plaintiff's facts as being true, it is apparent that a ROPS, while it might change the nature of the hazards attendant to use of the Model 416–8, would not eliminate them and would also impair the Model 416–8's usefulness.

### 2. Braking System

The Model 416–8 employs a transmission band braking system. Plaintiff does not allege that the band braking system failed. Rather, plaintiff argues only that other braking systems, notably disc brakes, require equal braking force in forward and reverse, while band brakes require the operator to exert more force to stop a tractor moving in reverse than to stop a tractor moving forward. (Pl.'s Mem. in Opp'n to Def.'s Mot. for Summ.J., Ex. P). Defendant does not contest this fact.[8] Presumably, plaintiff's argu-

---

8. Both plaintiff and defendant have conducted tests on band brakes which demonstrate precise-

ly this point.

ment is that requiring more force to brake in reverse than in forward is an unsafe characteristic of the tractor. What plaintiff has failed to do, however, is suggest how Mrs. Monahan's accident was caused by this "unsafe characteristic," and that a different braking system, such as disc brakes, would have made the tractor safer or changed the outcome of Mrs. Monahan's accident.

It is disputed whether or not Mrs. Monahan braked the tractor before her accident. Defendant asserts that there is no evidence that she did, while plaintiff presents evidence that Mrs. Monahan did brake the tractor, and that the wheels made skid marks after being braked. David Roth stated in his deposition that there were skid marks of about four feet on the lawn's slope, and Sean Monahan described seeing skid marks on the rear left wheel of the tractor. (Pl.'s Mem. in Opp'n to Def.'s Mot. for Summ.J., Ex. H; Sean Monahan Dep. at 184). In accepting plaintiff's evidence and interpretation of the evidence, I find that Mrs. Monahan braked the tractor before the accident. The skid marks show that the braking system worked: the brakes engaged to prevent the wheels from turning, which made the marks.

Plaintiff's evidence does *not* show that Mrs. Monahan was unable to apply the necessary force to engage the brakes; it shows the opposite. Therefore, having a band braking system requiring varying force in forward and reverse does not render the tractor unsafe. Merely because an alternative braking system exists does not mean either that the chosen system is unsafe or that the alternative is safer.

### 3. Tractor Stability

Plaintiff argues that the Model 416–8 is unstable because it has a high center of gravity, even while conceding that the possibility of a rollover "likely cannot be completely eliminated without destroying the utility of the product." (Pl.'s Mem. in Opp'n to Def.'s Mot. for Summ.J., Ex. B). It is not surprising, then, that plaintiff offered no specific evidence, or even suggestions, as to how the allegedly unsafe character of the tractor's center of gravity could be eliminated without reducing the tractor's utility. Plaintiff did not contend, for example, that a specific amount of weight added to a specific part of the tractor would meaningfully alter the center of gravity. While designing a very heavy tractor with very wide treads might make it less likely to roll over, it would likely destroy the utility of the lawn tractor, for no homeowner can mow his or her lawn with a Sherman tank.[9]

Defendant has shown that stability was one of its design criteria, and that changes in the tractor to increase stability would impair the tractor's utility. For example, the tractor was designed to be roughly symmetrical in weight and dimensions along the center line of the machine. (Def.'s Mot. for Summ. J., Ex. D). The tractor's transmission and front axle are made of cast iron, to add weight lower down. The tractor has an angle iron frame, adding weight to the lower part of the machine. The tractor has wide tires. Furthermore, Toro points out that if the tractor is wider than the mower deck, the utility of the mower is reduced because the tractor would reach where the mower blades could not. The Model 416–8 is slightly less than 36 inches wide; the smallest mower deck attachment is 36 inches wide. (*Id.*). I am forced to conclude that plaintiff's abstract contention that adding weight would lower the center of gravity, while true, would not necessarily make the tractor any safer because added weight has its own hazards, while making the tractor wider would reduce its utility.

### 4. Slope–Indicator Device

Plaintiff asserts that the tractor was unsafe because it lacked a device for measuring the slope of terrain on which it could be operated. Plaintiff argues that a slope-indicator would have promoted operator safety without impairing tractor utility.

Toro contends that not only would such a device not eliminate the hazard of operating

---

**9.** Adding more weight would not necessarily make the tractor safer. Indeed, according to plaintiff's expert, the "weight ... of the Model 416–8 lawn tractor is sufficient to cause serious injury in the event of a machine tipover." (Pl.'s Mem. in Opp'n to Def.'s Mot. for Summ.J., Ex. O).

the tractor on a slope, but would make the tractor less safe in at least two ways. Defendant offered evidence that a slope indicator rests in fluid, so that vibration from the tractor and the terrain would prevent an accurate reading. (Def.'s Mot. for Summ.J., Ex. D). Therefore, the device would not make the tractor safer. Further, Toro offered evidence that a slope-indicator would make the tractor less safe by requiring the operator to concentrate on reading the device when, if the tractor is actually on a dangerous slope, the operator should be concentrating on maneuvering carefully to get off the slope. (*Id.*, Ex. G). Defendant's expert also offered evidence that the device could provide a false sense of safety, because factors other than slope measurement—for example, ground moisture, bumps, and ruts—may make an otherwise safe slope hazardous. (*Id.*).

I find that plaintiff has not shown that a slope-indicator would make the machine safer, but that, at best, it might provide an operator with an additional means to check a slope he or she was already on without providing a means to check a slope onto which the operator might venture. The information so provided would not make the tractor safer and may in fact make it less safe. As to this fourth *Shetterly* factor, I conclude there is no evidence that a ROPS would have made the Model 416–8 more safe while also maintaining its utility; that a band braking system did not make the tractor unsafe with regard to Mrs. Monahan's accident; that changing the tractor's center of gravity by adding weight or making the tractor wider would not have made the machine safer without impairing its utility; and that a slope-indicator device would not make the Model 416–8 safer and may make it less safe. This factor, then, weighs against a finding that the Model 416–8 was unreasonably dangerous.

### E. User's Ability to Avoid Danger by Exercising Care

Given the tragic nature of Mrs. Monahan's accident, I am reluctant to assess what she could or could not have done to avoid the danger of operating the tractor on a slope. Nonetheless, the undisputed evidence shows that she had the ability to avoid the danger in which she placed herself by not mowing that portion of lawn with the tractor.

■ Plaintiff and defendant disagree as to the slope of the lawn where the accident occurred. Accepting plaintiff's expert's measurements for the purpose of this motion, I find that the slope of the lawn at the site of the accident was anywhere from 11.6 degrees to 15 or 16 degrees.[10] (Pl.'s Mem. in Opp'n to Def.'s Mot. for Summ.J., Ex. B). These measurements are within the "danger zones" indicated on the tractor's warnings.[11] (Def.'s Mot. for Summ.J., Ex. L). Furthermore, Mrs. Monahan had had a rollover accident with the same tractor the year before the fatal upset, albeit on a steeper section of the yard. After that incident, the Monahans agreed to stay off the hill with the tractor and use a push mower instead. (Sean Monahan Dep. at 72). In referring to another steep portion of the yard, in the back of the house, Sean Monahan said that "it was too steep a grade" on which to use the tractor and that his mother always told him to stay off of it. (*Id.* at 78–79). The evidence presented shows that Mrs. Monahan could have avoided the hazards inherent in mowing a steep portion of the lawn by not using the tractor on that section and using a walk-behind mower instead. This option, available to Mrs. Monahan, counsels against finding that the Model 416–8 was unreasonably dangerous.

### F. User's Anticipated Awareness of Product's Inherent Dangers and their Avoidability, Either Because of General Public Knowledge or Existence of Suitable Warnings

Any motorized vehicle carries certain substantial risks to the user. *See Shetterly*, 719 F.Supp. at 402. Through constant use the general public has shown its acceptance of

---

**10.** Defendant asserts that the slope measured 28 degrees. (Def.'s Mot. for Summ.J., Ex. I).

**11.** The warnings read, "DANGER TO AVOID INJURY Never Mow Side Hill Over 5° Never Mow Up Hill Over 10° Never Mow Slope Over 15°."

the conclusion that such products are not unreasonably dangerous merely because they may be involved in accidents or because an operator may be injured during their use. Similarly, a riding lawn tractor is not unreasonably dangerous just because there is the possibility of tipover.

Both the tractor at issue and its operator's manual contained warnings about the dangers of rollovers. The warnings cautioned about mowing on steep areas generally, and also showed pictures of tractors on inclines of specific slope with the universal red slash for "no" through them. (Def.'s Mot. for Summ. J., Ex. L). The operator's manual repeated these warnings and described other factors that affect tractor stability, including bumps or holes, changes in steering or braking, operator's size and position, and moisture of the grass. (*Id.*). Plaintiff suggested a different sort of warning label—one that specifically warned of the danger of rollovers. (Pl.'s Mem. in Opp'n to Def.'s Mot. for Summ.J., Ex. V). That an alternative type of warning could be given does not mean that the warning that was given is inadequate; different is not necessarily better. I note that, while plaintiff's version of a warning is more graphic about the hazard of rolling over on a tractor, it makes no mention of what specific degree slopes to avoid, only to avoid "steep slopes." Defendant's version cautions that a slope of even five degrees can be hazardous. Plaintiff's suggested warning also does not caution that factors other than slope affect stability. Further, while defendant's warnings illustrate tractors mowing up, down, and across slopes (with the slash through them), plaintiff's suggested version shows only a tractor mowing across a slope, which might lead an operator to believe that it is safe to mow up or down a steep slope, as long as one does not mow across it. Moreover, in addition to warnings on the tractor and in the manual, Mrs. Monahan was aware of the danger of tractor tipover; she had tipped over once before on a steep part of the lawn.

I conclude that there is general public awareness that dangers attend the use of motorized vehicles, and that the warnings on this machine and in the operator's manual provided specific notice to the public that the Model 416–8 should not be operated on certain slopes. Furthermore, Mrs. Monahan had actual knowledge that the tractor could roll over on a slope. These conclusions mitigate against a finding that the Model 416–8 was unreasonably dangerous.

G. Feasibility on the Part of Manufacturer of Spreading Loss by Higher Product Cost or Insurance.

Defendant should not have to spread among its customers the economic loss resulting from injuries from a product that is not defective, and for which the risk of harm can be eliminated by operating the product properly and heeding given warnings. I find that, as a matter of sound policy, the allocation of risk should not be on Toro.

Based on a consideration of the seven *Shetterly* factors, in light of the facts presented, or not contradicted, by the plaintiff, I find as a matter of law that the Model 416–8 was not "unreasonably dangerous," and that defendant should not bear the risk of loss in this case. Therefore, Toro's motion for summary judgment on the ground that it is not strictly liable must be granted.

III. NEGLIGENCE

 Plaintiff alleges that Toro was negligent in failing to ensure that the tractor was safe, failing to design and install a sufficiently safe braking system, designing an unstable tractor, failing to equip the tractor with a ROPS, failing to install a seatbelt, and failing to properly warn the operator. Defendant moved for summary judgment on plaintiff's negligence claims, arguing that, under Pennsylvania law, an identical "duty" requirement applies to both strict liability and negligence. Therefore, defendant contends, if the tractor was not found to be unreasonably dangerous, then defendant had no duty to redesign it. Defendant is mistaken as to the law of strict liability versus the law of negligence in Pennsylvania. While the Pennsylvania Supreme Court has not addressed the question of whether an absence of "duty" in strict liability is determinative of the absence of duty in negligence, the Third Circuit has predicted how the state court would resolve the issue.

*Griggs v. BIC Corp.*, 981 F.2d 1429, 1435 (3d Cir.1992). The Third Circuit pointed out in *Griggs* that the analysis necessary to a determination of strict liability is different than the analysis of negligence. Foreseeability has no place in the former; it is an integral part of the latter. *Id.* at 1435. Thus, the *Griggs* court stated that "holding 'no duty' in strict liability does not *per se* eliminate consideration of the duty factor in negligence law." *Id.* What duty, if any, Toro owed plaintiff, is a question of law that I must consider.

■■■■■ To succeed on a claim of negligence, a plaintiff must establish: (1) a duty or obligation recognized by the law, requiring the actor to conform to a certain standard of conduct; (2) a failure to conform to the required standard; (3) a causal connection between the conduct and the resulting injury; and (4) actual loss or damage resulting. *Kleinknecht v. Gettysburg College*, 989 F.2d 1360, 1366 (3d Cir.1993); *Griggs*, 981 F.2d at 1434 (citations omitted). If the defendant does not owe a duty to the injured plaintiff, then defendant has no tort liability to the plaintiff. The test of negligence is whether the wrongdoer could have foreseen the likelihood of harm to the plaintiff resulting from defendant's conduct. *Griggs*, 981 F.2d at 1435 (citations omitted). If the risks attending defendant's conduct were foreseeable, the last part of a traditional duty analysis is whether the foreseeable risks were unreasonable. I find that they were not.

■■■■■ For the purposes of defendant's motion for summary judgment, I will assume that the risks of Toro's acts—not installing a ROPS, not using a disc braking system, and not having a different center of gravity— were foreseeable. The Third Circuit has predicted that the Pennsylvania Supreme Court would employ a risk-utility analysis to determine if the foreseeable risks were unreasonable. *Griggs*, 981 F.2d at 1435–36. The analysis balances "the risk, in light of the social value of the interest threatened, and the probability and extent of the harm,

against the value of the interest which the actor is seeking to protect." *Id.* at 1436.

As discussed above, the risk of death from a lawn tractor is estimated at 75 deaths per year, or one death for every 102,000 riding mowers in operation. I note that this is substantially less than the number of deaths at issue in the *Griggs* case, which addressed the issue of whether the defendant in that case, a manufacturer of disposable cigarette lighters, had a duty to make the lighters childproof.[12] This probability and gravity of risk must be balanced against the utility of Toro's conduct in question. It is this part of the equation—rather than the difference in the number of deaths per year—that distinguishes this case from *Griggs*. Unlike the defendant in *Griggs*, Toro's interest in designing its tractor with the features it has— or, put another way, in not employing those suggested by plaintiff—was not "one of cost and its own economic health." *Id.* Rather, as I found in the discussion of the fourth *Shetterly* factor above, Toro's interest in not using a rollbar or different braking system, or making the tractor heavier or wider, was premised on safety and utility. Cost was not a factor. (Def.'s Mot. for Summ.J., Ex. D).

On balance, Toro's interest in the safety and utility of the Model 416–8, which it has argued would be impaired by the design features suggested by plaintiff (or, in the case of disc brakes, would not have made a difference in regard to the accident), outweighs the relatively low probability of death from the tractor. In such circumstances, the foreseeable risk of Toro's conduct in not redesigning the tractor would not be unreasonable. Therefore, Toro had no duty to plaintiff to redesign the Model 416–8, and Toro's motion for summary judgment on negligence claims regarding the tractor's design must be granted.

■■■■■ The duty to warn is a different matter. Holding that Toro had no duty to redesign the tractor does not mean that Toro had no duty to warn Mrs. Monahan about dangers associated with its use. Assuming that Toro had a duty to warn about possible haz-

---

12. In *Griggs,* the court found that 120 deaths per year occurred from residential fires started by children playing with lighters. 981 F.2d at 1436.

ards concerning operation of the tractor, the question is whether plaintiff can establish that insufficient warnings caused Mrs. Monahan's injury. *Kleinknecht,* 989 F.2d at 1366.

Plaintiff does not assert that Toro failed to provide any warnings about the Model 416–8. Rather, Monahan claims that the warnings which Toro provided both on the machine and in the operator's manual were neither proper nor adequate. The warnings are described above, as is plaintiff's suggested alternative that more specifically articulates the hazard of a rollover. While plaintiff has offered a different version of a warning, plaintiff has offered no evidence to suggest that Mrs. Monahan could not see the warnings which were provided, that she did not read them, or that she was unable to understand them. Instead, plaintiff claims that the warnings should have been more precise about the danger of using the tractor on a slope and the possibility of rollover. Plaintiff's argument is flawed, however, because Mrs. Monahan was well aware of the danger of a rollover even without a warning expressly stating it. She had had a rollover in the spring of 1991, one year before the fatal accident. (Sean Monahan Dep. at 64). Thus, the plaintiff can point to no evidence that would show that the alleged insufficiency of defendant's warnings—not explicitly illustrating and warning of the hazard of a rollover—in any way caused Mrs. Monahan's accident because unrefuted evidence shows that Mrs. Monahan was independently aware of the danger of using the tractor on a slope. Therefore, defendant's motion for summary judgment on the issue of negligence for failure to warn must be granted.

## IV. CONCLUSION

On the question of strict liability, I hold that, upon analysis of the evidence in light of the *Shetterly* factors, the Toro Model 416–8 tractor was not "unreasonably dangerous" as a matter of law. On the claims of negligence, I hold that defendant had no duty to redesign the tractor. Further, defendant was not negligent with regard to the tractor's warn-

ings. Therefore, defendant's motion for summary judgment on the claims of strict liability and negligence must be granted.[13]

---

**13.** Although plaintiff included in his complaint an allegation that the tractor was not merchantable and not fit for ordinary use, no evidence or

argument was ever made on this breach of warranty claim. I find that this ground for relief was abandoned.