Lynda RILEY, R.N., Plaintiff

v.

BECTON DICKINSON VASCULAR
ACCESS, INC., Defendant.

Civil Action No. 94–1482.

United States District Court,
E.D. Pennsylvania.

Dec. 29, 1995.

Herbert F. Kolsby, Kolsby, Gordon, Robin, Shore & Rothweiler, Philadelphia, PA, for plaintiff.

Suzanne Ilene Schiller, James Michael Beck, Gay Barlow Parks Rainville, Pepper, Hamilton & Scheetz, Philadelphia, PA, for defendant.

## MEMORANDUM

TROUTMAN, Senior District Judge.

The above-captioned action arises from a tragic accident in which the plaintiff, a twenty-three year old nurse, contracted the HIV virus as a result of being stuck with an I.V. catheter needle after initiating an I.V. in a patient in the Intensive Care Unit of Community Hospital of Lancaster where she was employed.[1]

Plaintiff asserts that defendant, Becton Dickinson Vascular Access, Inc., is strictly liable for her injury in that the I.V. catheter, an Angiocath manufactured by defendant and used by plaintiff to initiate the I.V., is unsafe for its intended use because the needle, contaminated by the patient's blood, remains exposed after it is withdrawn from the catheter, thus permitting a needle-stick accident to occur. Plaintiff contends that such design is defective and that an available and feasible alternative design of the catheter, in which the needle is retracted into a plastic sheath as it is withdrawn, would have prevented her accident and consequent injury if she had been using such alternative device at

1. The device here involved is a peripheral I.V. catheter, which consists of a needle and a slender flexible, hollow tube designed to be inserted into a vein in the patient's arm, hand, leg or foot. The needle is used to gain access to the patient's vein and is then withdrawn through the catheter tubing, which remains attached to the patient's vein for infusion of fluids and/or medications as needed. (Affidavit of Jacqueline Frailey, Exh. B to Becton Dickinson Vascular Access Inc.'s Motion for Summary Judgment, Doc. # 10, ¶¶ 5, 8, 9).

the time the incident in which she was injured occurred.

Presently before the Court is defendant's motion for summary judgment. Although defendant concedes that the Angiocath is capable of causing injury because a sharp instrument is an integral part thereof, defendant contends that the design of the Angiocath is not defective for that reason. Rather, defendant argues that a risk/utility analysis undertaken pursuant to Pennsylvania law demonstrates that the Angiocath is not unreasonably dangerous and, hence, that this Court should not, as a matter of social policy impose the costs of plaintiff's loss upon the manufacturer of the device.[2] Defendant further contends that the decision of the federal Food and Drug Administration, (FDA), after public hearings and due consideration, not to require a protective sheathing device on all needles preempts the regulation of needles by court decision as a matter of law, or, at least, should be followed as a matter of social policy in this case. Hence, defendant requests that the Court here, grant judgment in its favor on plaintiff's strict liability claim.

## I. FACTUAL BACKGROUND

The essential facts underlying plaintiff's claim are not in dispute. Plaintiff Lynda Riley received a Bachelor of Science and Nursing degree from York College in May, 1992, and was subsequently employed as an ICU staff nurse at Community Hospital of Lancaster, where initiating I.V. lines was a daily part of her duties. (Deposition of Lynda Riley, Exh. A to Becton Dickinson Vascular Access Inc.'s Motion for Summary Judgment, Doc. # 10, at 11, 52).

On September 9, 1992, plaintiff was working in the hospital's intensive care unit when a patient unfamiliar to her was admitted on an emergency basis from the hospital's outpatient clinic. (Id. at 47). Although plaintiff had no information concerning the patient's medical history and condition, plaintiff was specifically instructed to observe "blood and body fluid precautions" and to initiate an I.V. (Id. at 50, 51). To do so, plaintiff obtained the necessary equipment including, inter alia, an Angiocath manufactured by defendant, the only type of I.V. catheter available to her.

Plaintiff initiated the I.V., removed the needle from the catheter, and was preparing to dispose of the needle when the patient's left arm moved, plaintiff reacted to his movement by moving her hand, and the needle penetrated her left palm. (Id. at 67–69).

Plaintiff was immediately given an HIV blood test to establish a baseline and subsequently tested negative for the virus twice. A third test administered on March 31, 1993, however, revealed that she had contracted HIV from the needle stick more than six months before. Plaintiff has been on available medication since May, 1993, and was transferred from patient care to another job in the hospital until she stopped working due to her illness.

## II. STRICT LIABILITY CLAIMS

■ As recently noted in *Phillips v. A.P. Green Refractories Co.*, 428 Pa.Super. 167, 630 A.2d 874 (1993), when presented with claims arising under § 402A of the RESTATEMENT (SECOND) OF TORTS, it is necessary for courts applying Pennsylvania law to determine, initially and as a matter of law, whether the product in question is "unreasonably dangerous." *See, also, Mackowick v. Westinghouse Electric*, 525 Pa. 52, 575 A.2d 100 (1990); *Azzarello v. Black Bros. Co., Inc.*, 480 Pa. 547, 391 A.2d 1020 (1978); *Dambacher by Dambacher v. Mallis*, 336 Pa.Super. 22, 485 A.2d 408 (1984). Such determination is to be made by weighing the utility of the product against the likelihood and seriousness of the injury claimed and the availability of precautions which might have prevented the injury in order to reach the ultimate conclusion whether, as a matter of social policy, the risk of loss is appropriately placed upon the supplier of the product. *Phillips*.

■ The obligation of the trial court in a strict liability action to determine whether the risk of loss for injuries arising from an allegedly defective product should fall on the

---

**2.** The parties agree that Pennsylvania law applies to this diversity action.

supplier, *i.e.,* to determine whether the product is "unreasonably dangerous", was also discussed in detail by the Court of Appeals for the Third Circuit in *Griggs v. BIC Corporation,* 981 F.2d 1429 (1992). In *Griggs,* the court noted that such determination is to be made prior to permitting a jury to consider plaintiff's evidence of the specific defect alleged and whether such alleged defect was the proximate cause of injury, since a decision against the plaintiff on the threshold inquiry amounts to a judicial conclusion that the product is not defective as a matter of law.

In *Nowak v. Faberge,* 32 F.3d 755 (3rd Cir.1994), the Court of Appeals further noted that, although a trial court is required to determine the initial social policy issue prior to permitting the jury to consider the defendant's liability to the plaintiff, the court's decision to send a strict liability case to the jury may qualify as an implicit determination on this matter. Defendant bears the burden of requesting that the trial court make an explicit ruling on this threshold issue if it seeks to have the matter determined at an earlier stage of the litigation.

Since, in *Nowak,* the Court of Appeals also stressed the value of an explicit ruling on this issue, defendant's pending motion for summary judgment, limited to the question whether the Angiocath is "unreasonably dangerous" as that term is defined by Pennsylvania law, is an appropriate means of seeking the Court's consideration of the question whether the risk of loss from plaintiff's injury should be placed upon defendant. *See, also, Childers v. Joseph,* 842 F.2d 689, 696, n. 7 (3rd Cir.1988).

Plaintiff and defendant, and, indeed, the Court of Appeals, agree that Pennsylvania courts have approved weighing the unavoidable danger of a product against its utility in order to determine whether a product is "unreasonably dangerous." *Id.* at 697. Plaintiff also contends, however, that in addition to the risk/utility analysis, a more global "social policy" test should be applied whereby the Court determines whether imposing liability upon the defendant under the circumstances of a particular case would further the goals of strict product liability. Plaintiff appears to argue that under the broader social policy test, the Court can and should find a product unreasonably dangerous if the manufacturer can distribute the risk of loss from injuries to the public as a cost of doing business, since, in that event, permitting the plaintiff to proceed to a jury with the question whether the product is defective is an appropriate application of the law of strict liability.

We will first consider the danger inherent in the Angiocath under the unquestionably applicable risk/utility analysis to determine whether the product is unreasonably dangerous in light of its utility and the availability of similarly useful devices which might reduce or eliminate the risk to healthcare workers from exposed I.V. catheter needles. We will then consider plaintiff's argument that a broader and more general "social policy" test has been approved by the Pennsylvania courts as an adjunct or alternative to the risk/utility analysis. We will consider, as well, defendant's contention that the FDA's explicit decision not to require protective devices on needles and decision not to ban the use of needles lacking protective devices preempts plaintiff's claim or, at least, should compel the Court to conclude that the Angiocath is not unreasonably dangerous as a matter of law.

## III. RISK/UTILITY ANALYSIS UNDER PENNSYLVANIA LAW

The parties agree that the Pennsylvania courts have adopted a risk/utility test which requires consideration of the following factors in aid of the determination whether a product is unreasonably dangerous:

1. The usefulness and desirability of the product—its utility to the user and to the public as a whole.

2. The safety aspects of a product—the likelihood that it will cause injury, and the probable seriousness of the injury.

3. The availability of a substitute product which would meet the same need and not be as unsafe.

4. The manufacturer's ability to eliminate the unsafe character of the product with-

out impairing its usefulness or making it too expensive to maintain its utility.

5. The user's ability to avoid danger by the exercise of care in the use of the product.

6. The user's anticipated awareness of the dangers inherent in the product and their avoidability, because of general public knowledge of the obvious condition of the product, or of the existence of suitable warnings or instructions.

7. The feasibility, on the part of the manufacturer, of spreading the loss of setting the price of the product or carrying liability insurance.

*Fitzpatrick v. Madonna,* 424 Pa.Super. 473, 623 A.2d 322, 324 (1993); *Dambacher,* 336 Pa.Super. 22, 485 A.2d at 423, n. 5.

In *Barker v. Deere & Co.,* 60 F.3d 158, 166 (3rd Cir.1995), the Court of Appeals cited a somewhat simpler formulation of the appropriate risk/utility analysis, likewise found in *Fitzpatrick* and *Dambacher,* as the definitive statement of the law of Pennsylvania on this matter:

> Furthermore, the court in *Fitzpatrick* observed that factors to be considered when undertaking this analysis include: "[1] the gravity of the danger posed by the challenged design; [2] the likelihood that such danger would occur; [3] the mechanical feasibility of a safer design; [4] the financial cost of a safer design; and [5] the adverse consequences to the product that would result from a safer design."

(Citations omitted). Since the expanded list of factors cited by both parties to this action provides no more than a detailed parsing of the same considerations cited in *Barker,* we will first consider the issue in terms of the more expansive list of risk/utility factors.

Although the parties agree on the applicable legal standards, they obviously disagree as to the outcome when such standards are properly applied in this action. Upon review of the parties' respective arguments, it appears that their differing conclusions are based upon the different emphasis placed by each party on the various factors.

Plaintiff focuses almost exclusively upon the devastating potential effects of a needle stick accident which, as here, can lead to the transmission of a serious, even deadly, blood-borne disease, as well as upon the ready availability of an alternative design, already on the market, which plaintiff contends is feasible and eliminates the danger inherent in the design of the Angiocath.

Defendant, on the other hand, argues that although each needle stick accident involving HIV exposure is potentially very serious, there are very few accidents given the widespread use of the product. Defendant also contends that the alternative product touted by plaintiff does not meet the same equipment needs as the Angiocath and does not eliminate the potentially serious risk of needle sticks or other blood exposure. Defendant also notes that because the equipment available to medical personnel in a hospital is selected by hospital staff members, the manufacturer of such equipment should not, as a matter of law, be held liable to a person injured by the equipment selected for a particular task. Thus, defendant argues that it is not appropriate to place the risk of loss in this case upon the manufacturer of the product, since such a course would require that the cost of plaintiff's injury be borne by all users of the Angiocath, despite the fact that it may be the best product to use in many situations, and despite the fact that plaintiff's use of the Angiocath resulted entirely from the decision of her employer not to make an alternative product available to her. In essence, defendant argues that the utility of the Angiocath far outweighs its actuarially small, albeit grave risks, and asks whether, as a matter of social policy, the manufacturer should bear the high costs resulting from the relatively rare risks inherent in the product.

It is difficult, but absolutely essential, for the Court to be completely dispassionate in weighing the risks and benefits of the Angiocath in order to make the required social policy determination concerning the allocation of the risk of loss resulting from an accident such as that here involved. The social policy issue before the Court is not whether plaintiff deserves compensation for a terrible accident, but whether the manufacturer of the device through which she was injured is appropriately subject to liability

for the accident, and, therefore, can be required to provide such compensation.

■ We also note that defendant bears the burden of proof on the threshold determination of allocation of risk. *Monahan v. Toro Company*, 856 F.Supp. 955 (E.D.Pa.1994), and that all of the evidence on the threshold issue must be viewed in the light most favorable to the plaintiff. *Barker*, 60 F.3d at 166.

■ It is with these principles firmly in mind that we consider each specific factor of the risk/utility analysis.

### A. Utility of the Angiocath to the User and to the Public

It is obvious that many medical procedures depend upon the use of sharp needles to deliver vaccines and medication, to take blood samples, and, as here, to provide a means for intravenous delivery of fluids, nutrients and medicine. Thus, the availability of products such as the Angiocath is absolutely essential to modern medicine. Products which incorporate a sharp needle, therefore, are highly useful to the public as well as to medical professionals, who require devices which function well for their intended purpose, piercing skin and subcutaneous tissue.

The evidence submitted by defendant demonstrates that the Angiocath is such a device and is particularly well suited for use in certain situations, such as emergencies, and with patients in whom accessing a vein is more difficult than usual, *e.g.,* infants, small children and the elderly, since a different type of I.V. catheter is more difficult to use in those circumstances. (*See,* Doc. # 10, Exh. D at 55, 64; Exh. P at 163, 165, and Defendant's Exh. 28 to Deposition of Gaile Lefever; Exh. T).

The fact that an instrument such as the Angiocath is capable of causing injury to both the medical professional user and to the patient user does not in any way impair the usefulness of the product. Thus, we conclude that the product is both highly useful and that it's availability is desirable to both the medical profession and to the public at large.

### B. Safety Aspects

In analyzing this factor, we consider both the likelihood of injury from use of the product and the probable seriousness of the injury. To make that assessment in this case is somewhat less straightforward than usual in that the term "injury" has several meanings in the present circumstances. The needle stick itself is an injury of which there is a determinable likelihood, while exposure to HIV or another blood-borne disease is likewise an injury that is more serious but less likely, since most patients are neither HIV positive nor infected with any blood-borne disease. Finally, contracting such a disease is still less likely than exposure thereto, albeit far more serious. Thus, although it is indisputable that all exposures to HIV which result in infection are terribly serious, and, because of the deadly consequences of infection, all needle stick exposures to HIV contaminated blood are serious, it does not follow that all needle stick incidents present a risk of serious injury.[3]

To properly assess this factor in terms of social policy concerns, therefore, the Court must avoid undue consideration of the indisputable fact that whatever the theoretical risk to plaintiff of serious consequent injury from the initial needle stick injury, plaintiff did sustain that most serious of injuries. Nevertheless, that fact alters neither her theoretical risk of serious injury at the time of the initial needle stick injury, nor the theoretical risk of serious injury to all other users of the product in question. To make the requisite social policy determination, which

---

**3.** Our discussion of the risk of injury from a needle stick will be limited to the risk of exposure to and risk of contracting HIV for several reasons: (1) That is the injury involved in this action; (2) actual data available in the record is limited primarily to assessing the risk of exposure to HIV and HBV, (Hepatitis B Virus); (3) although the risk of contracting HBV after exposure via a needle stick is significantly greater than that of contracting HIV, the evidence discloses that healthcare workers can readily protect themselves by receiving the HBV vaccine, which provides over 90% protection from infection for seven years, and which OSHA regulations require hospitals to make available to healthcare workers free of charge. (*See,* Exh. E to Plaintiff's Response to Defendant's Motion for Summary Judgment, (Doc. # 13), at 155).

obviously affects every potential user of the Angiocath, the Court must focus on the general, theoretical risks inherent in the use of the product in terms of the likelihood that any needle stick injury involving an Angiocath will result in a serious injury, as that term is used herein, *i.e.*, exposure to HIV/ HIV infection.

Calculations from the evidence submitted by both parties to this action indicate that the risks of HIV exposure/HIV infection from an I.V. catheter are quite small. We note, first, that estimates of the rate of HIV infection from HIV exposure range from 0.3—0.47%. (*See, e.g.*, Plaintiff's Response to Defendant's Motion for Summary Judgment, (Doc. # 13), Exh D at 1–11; Exh. E at 155; Doc. # 10, Exh. G at 64032; Exh. L at 2637). Defendant has presented evidence that the risk of a needle stick from a conventional I.V. catheter is approximately 7.48 out of 100,000 uses of such a device and that the rate of HIV infection in 1990 was .9% of the population of hospital patients, based upon 225,000 HIV positive hospital patients out of a total of 25 million patients. (Doc. # 10, Exh. J at 15; Exh. K at 449). From this data, defendant estimated the rate of HIV infection at approximately one for every 500,000,000 uses of a conventional I.V. catheter. (*See*, Doc. # 10, Defendant's Brief in Support of Motion for Summary Judgment at 16).

Although plaintiff did not perform a similar calculation, and as noted by defendant, does not dispute defendant's estimate, the Court, in order to fulfill our obligation to view the evidence in the light most favorable to the plaintiff, has attempted to calculate the likelihood of HIV exposure/HIV infection from additional data included in evidence submitted by both parties. We begin with the estimate of the number of needle sticks to healthcare workers each year, which ranges from 800,000 to 1,000,000. (Doc. # 13, Exh. D at 1–10; Exh. E at 55; Exh. H). Next we consider the percentage of all needle sticks attributable to I.V. catheter stylets, which has been documented in a relatively small sample at approximately 2.0%, and was then projected to be approximately 18.4/100,000 uses. (Doc. # 10, Exh. W at 284, 285). Finally, based upon plaintiff's evidence, our estimate of the likely rate of HIV contamination is 2% of all needle sticks. (Doc. # 13, Exh. E at 155). Thus, using the figures most favorable to the plaintiff, 20,000 out of 1,000,000 needle sticks per year are likely to be attributable to an I.V. catheter stylet and 400 such needle sticks are likely to be HIV contaminated. At the previously estimated infection rate of .3—.47%, it appears that there are likely to be 1—2 HIV infections to healthcare workers per year from use of all I.V. catheter sets, both conventional and protected.[4]

Stated in other terms, if we assume that there are 18.4 I.V. catheter needle sticks per 100,000 uses of such devices, assume an HIV contamination rate of 2%, and assume the highest likely infection rate, .47%, there could be 17 HIV infections per 1 billion I.V. catheters used, both protected and conventional, or between 8 and 9 infections per 500,000,000 uses of an I.V. catheter set.[5]

Using defendant's projected rate of 7.48 needle sticks per 100,000 uses of a conventional catheter set, such as the Angiocath, but assuming a 2% contamination rate, and a .47% infection rate, the likelihood of HIV infection of healthcare workers is estimated at 7 per 1 billion uses of a conventional I.V. catheter or between 3 and 4 per 500,000,000 uses thereof.[6]

Although not as low as defendant's projected incidence of HIV infection from accidents

---

**4.** The Court's calculation can be stated as follows: 1,000,000 (# of needle sticks/year) × .02 (2% of needle sticks attributable to all I.V. catheters) × .02 (2% of patients likely to be HIV positive) × .003 (.3% likely rate of infection) = 1.2 (HIV infections/year).

With a projected infection rate of .47%, the same calculation estimates the number of HIV infections at 1.88/year. (1,000,000 × .02 × .02 × .0047).

**5.** .000184 (18.4 needle sticks/100,000 I.V. catheters) × .02 (2% HIV contaminated) × .0047 (.47% infections from exposure) = .00000017296 (17 infections/1 billion I.V. catheter uses = 8.5 infections/500,000,000).

**6.** .0000748 (7.48 needle sticks from conventional catheter set/100,000 uses) × .02 (2% contamination rate) × .0047 (.47% projected infection rate) = .000000007 (7/1,000,000,000 or 3.5/500,000,000 uses).

involving a conventional catheter, the Court's estimates, using a projected contamination rate and infection rate far more favorable to the plaintiff, likewise yield very low incidences of HIV exposure and infection via any expression of such risks, from an annualized projected risk based upon the highest likely number of I.V. needle sticks from all I.V. catheters, (approximately 400 exposures, less than 2 infections/year) to a projected risk from conventional catheters only, based upon a number of uses of such catheters (3.5/500,-000,000 uses).

Moreover, we note that the Court's calculations overstate the true risk, since the actual rate of HIV infection from exposure lies somewhere between .3% and .47%. With that consideration in mind, we further note that even using the lower infection rate as an estimate of the incidence of HIV infection from exposure, our projected risk calculation still overstates the actual incidence of HIV infection from defendant's products. Defendant has had only three reports of HIV infection from conventional I.V. catheters since 1981, a period during which defendant estimates that it sold 1.5 billion such devices. (*See*, Doc. # 10, Exh. B, para. 13).

From the available evidence and projections based thereon, the Court concludes that the risk of serious injury from use of an I.V. catheter such as the Angiocath is quite low.

## C. Availability of a Safer, Substitute Product

Plaintiff does not argue that there is an acceptable substitute for an I.V. catheter. Plaintiff points out, however, that there is an available substitute for a conventional I.V. catheter which leaves the introducing needle exposed after it is withdrawn from the flexible tube. The ProtectIV, an I.V. catheter manufactured by Critikon, a competitor of defendant, permits the needle to be retracted into a plastic sheath as it is withdrawn from the tube attached to the patient's vein. Indeed, at the time of plaintiff's injury, defen-

dant itself was marketing a similar device known as the Insyte Saf–T–Cath.[7]

A study of 1024 healthcare workers at nine hospitals in 6 states over a period of six months revealed that the incidence of needle sticks was lower with the ProtectIV, *i.e.*, 2.25 injuries per 100,000 compared to 7.48 injuries per 100,000 conventional devices. (*See*, Doc. # 10, Exh. J at 15). The significance level, or probability that the lower incidence of needle sticks accurately represents a reduction of the risk of a needle stick with the ProtectIV, was calculated as .0224 (*Id.*).

Although a reduction in the total number of needle sticks would obviously lessen the likelihood of serious injury, the projected risks of HIV exposure and infection from any one such needle stick are identical to the risks associated with a needle stick from a conventional catheter, since the rate of HIV exposure and infection depend upon the patient population, not the type of I.V. catheter used. Based upon a projected incidence of 2.25 needle sticks per 100,000 uses of a protected catheter, the projected risk of HIV infection from an I.V. catheter needle stick would be reduced from 3.5/500,000,000 uses with a conventional catheter to 2/1,000,000,-000 uses or 1/500,000,000 uses with a protected catheter.[8] Consequently, it appears that an already small risk might be somewhat reduced, but would not be eliminated, by use of a protected rather than a conventional I.V. catheter.

We note, however, the low significance level of the available data, likely attributable to the far smaller number of uses of the protected catheters during the study, *i.e.*, 88,720 uses of protected devices compared to 147,-040 uses of the conventional devices, a difference of more than 58,000.

The questionable reliability of projections based upon a relatively short study and a relatively small population is best illustrated by the experience of the Community Hospital of Lancaster, where plaintiff was employed. That hospital's data does not reflect a decrease in the number of needle sticks attrib-

---

**7.** Defendant's alternative catheter was later withdrawn from the market when an injunction was entered in a patent infringement suit brought by Critikon against Becton–Dickinson.

**8.** .000025 (2.5 needle sticks/100,000 uses) × .02 (2% contamination rate) × .0047 (.47% infection rate) = .000000002 (2/1,000,000,000 or 1/500,-000,000).

utable to I.V. catheters after the ProtectIV was put into general use, at least during the periods for which such data was compiled and made available in the present record. Rather, the evidence discloses that two needle sticks attributable to I.V. catheters occurred at Community Hospital of Lancaster between March, 1991, and November, 1992, a 19 month period during which the Angiocath was the product generally available to its staff, and that two needle sticks were likewise reported in the three month period between April and July, 1993, after the ProtectIV had been introduced. (*See,* Doc. # 10, Exh. P, Defendant's Exh. # 46 to Deposition of Gaile LeFever).[9]

Moreover, the evidence also discloses that a third needle stick, definitely attributable to the ProtectIV, occurred in August, 1993. (Doc. # 10, Exh. P at 144). Although plaintiff points out that there were no reported needle sticks attributable to an I.V. catheter at Community Hospital of Lancaster between August, 1993, and September, 1994. (*See,* Doc. # 13, Exh. I at 327), we note that such experience is consistent with the historical incidence of needle sticks with the conventional Angiocath. The available data discloses that there had likewise been no needle sticks attributable to an I.V. catheter in the several month longer period between April, 1991, and September, 1992, when plaintiff's accident occurred. The Angiocath was the only product in general use at Community Hospital of Lancaster during that period.

Thus, the actual experience of one hospital in the use of conventional and protected catheters confirms that the small projected risk of serious injury from use of a conventional I.V. catheter is accurate, while the projected decrease in that risk with the use of a protected catheter is not likely to be achieved in practice until and unless the healthcare workers using the new device become proficient with it. Indeed, such experience indicates that the risk of injury could initially increase.

Such conclusion is supported by anecdotal evidence relating to certain difficulties and drawbacks inherent in the design of the protected catheter which became evident during the early clinical experiences at Community Hospital of Lancaster. We note, *e.g.,* that contrary to plaintiff's argument that the ProtectIV provides "automatic" protection from an exposed needle, the record shows that the introducer needle is retracted into the protective sheath only if the person initiating the I.V. activates that mechanism by sliding the sheath front, over the needle, as the needle is withdrawn through the catheter. (Doc. # 10, Exh. P at 89). Failure to properly engage the mechanism by fully extending the sheath until it "clicks" allows the sharp tip of the needle to remain exposed, which can, and at Community Hospital of Lancaster did, result in a needle stick. (*Id.* at 144–145).[10]

**9.** We note that an I.V. catheter needle stick noted in March, 1993, around the time the hospital switched from conventional to protected I.V. catheters, cannot be attributed with confidence to either device. (*See,* Doc. # 10, Exh. P, Deposition of Gaile LeFever at 274).

Indeed, Ms. LeFever testified that she could not be certain whether any of the needle sticks reported between March, 1993 and July, 1993, could be attributed to the protected catheter. (*Id.*) Ms. LeFever also testified, however, that it had been introduced into general use in the hospital in late March, 1993, so it is reasonable to infer that needle sticks which occurred after that date are more likely attributable to the protected device in light of the low incidence of I.V. catheter needle sticks prior to that time, in light of the difficulties experienced by the hospital staff in using the new device, as indicated by numerous complaints from the staff, and in light of the extensive training needed prior to introducing the ProtectIV for general use, described by Ms. LeFever as "massive inservicing", as well as the hospital's subsequent decision to request additional training from the manufacturer of the ProtectIV. (*Id.* at 91; Exh. T; Doc. # 13, Exh. I at 325, 328).

**10.** As defendant points out, given the undisputed circumstances of plaintiff's accident and the operation of the ProtectIV, it is not at all certain that she could have avoided the needle stick if she had been using it, since she reacted to a patient's sudden movement by an apparently reflexive movement of her own. It is not possible, therefore, to infer that plaintiff would have been able to completely engage the protective mechanism of the ProtectIV before the incident occurred. Had the needle been suddenly withdrawn from the catheter in response to the patient's movement and the tip remained exposed, a needle stick could have occurred, just as it did when a nurse in the hospital's birthing center failed to fully engage the sheath of the ProtectIV in August, 1993. (Doc. # 10, Exh. P at 144–145).

Moreover, the available evidence also discloses that even if the incidence of needle sticks is ultimately somewhat reduced by using the ProtectIV, a healthcare worker's exposure to a patient's blood may not be significantly reduced since more blood escapes from the catheter as the needle is withdrawn than occurs with a conventional I.V. catheter. (*See, e.g., Id.* at 140–141; 261. *See, also,* Doc. # 13, Exh. E at 161: "[The Critikon ProtectIV] terminates in a Luer hub without a septum (or extension tubing) which exposes the user to the patient's blood. The manufacturer recommends using digital pressure above the catheter tip during the procedure, quickly connecting the IV set, and using gloves to minimize blood contact.")

Other problems with the ProtectIV were also reported at Community Hospital of Lancaster, such as: faster deterioration of IV sites; failure of the catheters to lock in place because the catheter, not the needle, penetrated the patient's vein; malfunction, such as the needle penetrating the catheter shaft as it was withdrawn; catheter kinking and bending; difficulty using the catheters on infants, small children, elderly patients and others with difficult veins. (Doc. # 10, Exh. P at 154–155; 265–266; Defendant's Exh. 25 to Exh. P; Exh. T). Many such problems would likely result in the need for additional I.V. initiations, thereby actually increasing the potential for a needle stick by increasing the number of times an I.V. introducer needle is used.

Although the evidence indicates that difficulties with the ProtectIV diminished after the staff at Community Hospital of Lancaster received additional training using it, all such problems were clearly not completely resolved, since conventional I.V. catheters remain available to the staff for use in situations in which such devices are preferable. (*See, Id.,* Exh. D at 64, 65; Exh. P at 171, 174; Doc. # 13, Exh. I at 325.)

Finally, the evidence discloses that the experience of Community Hospital of Lancaster appears to be neither unusual nor unique. In a September, 1992, article in a publication for healthcare workers, a San Francisco hospital employee stated that the design of the protected catheter requires improvement and described similar complaints and concerns about the protected catheters as those noted by the staff of the Lancaster hospital. (Doc. # 10, Exh. U). In addition, such article noted no decreased exposure to serious injury from needle sticks: "Curiously, respondents who had used protective devices did not report greater levels of reduced exposure to contaminated needles than did non-users." (*Id.* at 30).

We conclude, therefore, that although the small projected risk of a needle stick might be further reduced by substituting a protected I.V. catheter for a conventional device, assuming that the user is proficient with the new device, the danger of a needle stick cannot be eliminated. Moreover, a reduction in the incidence of needle sticks is by no means assured, and, even if achieved, blood exposure may not be significantly reduced, if at all, due to a generally recognized "backflow" problem which occurs when the needle is withdrawn from the catheter and the I.V. connection is not completed quickly. We further conclude that other design features of the available substitute product render it less effective, in general, than the Angiocath for its intended purpose, since use of the protected catheter may not be appropriate in some situations due to difficulties that cannot be easily overcome, if at all, with certain patients.

Thus, although a substitute for a conventional I.V. catheter is available which may reduce the incidence of needle sticks, it is not entirely certain that such substitute is safer overall when other aspects of the alternative design are considered and it does not appear to be an alternative which can feasibly replace conventional I.V. catheters completely.

D. *Elimination of the Unsafe Character of the Product without Impairing Usefulness or Making It Too Expensive*

As already discussed in detail in connection with the availability of a safer, comparable product, there is only one substitute for a conventional I.V. catheter on the market at present. With proper use, the alternative product does not leave the introducer needle exposed after it is withdrawn from the catheter. The protective design, however, does

not completely eliminate the danger of a needle stick since failure to properly activate the shielding device still leaves the needle exposed, and, in gaining a small safety improvement with respect to the risk of a needle stick, the alternative product creates other problems which do not occur with the use of a conventional I.V. catheter and which render the redesigned product less suitable for some uses.

In addition, the cost of the protected catheter far exceeds that of the conventional device. At the time the Community Hospital of Lancaster first evaluated the ProtectIV in 1992, the cost was $1.40 per unit compared to $.78 for the Angiocath. (*See,* Doc. # 10, Exh. P, Defendant's Exh. 36 to Deposition of Gaile LeFever). Moreover, the unit cost of the catheters is not the only cost consideration. As noted, the evidence establishes the need for extensive training with the ProtectIV in order to gain the benefit of somewhat fewer needle sticks and to overcome the problems inherent in other aspects of the product to the greatest possible extent. The additional costs associated with training hundreds of hospital workers prior to introducing the protected device for general use, combined with the potential need for follow-up in-servicing, as occurred at Community Hospital of Lancaster, are also costs associated with use of the alternative product.

Although plaintiff argues that such increased costs of a substitute product are defensible in light of the devastating effects of the injury that she sustained, we note again that we are here concerned with the magnitude of the increased costs in light of the magnitude of the theoretical risks of a needle stick and the consequent costs associated with that risk of injury. In that regard, a discussion of the feasibility and desirability of using products designed to prevent needle sticks noted that "Hospitals should not pay an excessive amount to achieve only a minimal reduction in risk." (Doc. # 13, Exh. E at 174). The authors of the study also suggested an appropriate cost differential based upon the average costs of any needle stick injury: "On average, needlesticks cost an overall 36% above the purchase price of the devices. Thus, a hospital could pay an addi-

tional 36% for preventive devices (assuming that they would totally eliminate the costs associated with needle sticks) without increasing total costs." (*Id.* at 178).

It is clear, however, that needle sticks, and their associated increased costs, cannot be completely eliminated. Moreover, the authors of the discussion quoted above based their recommendation on the average costs associated with injuries from all types of needles likely to be encountered in a hospital. For present purposes, however, it is more accurate to use the increased needle stick costs associated only with I.V. stylets, which the authors estimate at 10% of the cost of such devices. (*Id.*)

Based upon evidence submitted by plaintiff, therefore, it appears that the higher unit cost of a protected catheter would be reasonable in light of its expected benefits if it were 10%–36% above the cost of an unprotected device.

By that measure, it is clear that the unit cost of the ProtectIV, approximately 80% above the cost of the Angiocath, is very high in light of the small benefit likely to be derived from the possible reduction, but not elimination, of the risk of a needle stick. Moreover, the increased unit cost does not include the costs of inservice training or the potential for higher usage due to faster deterioration of I.V. sites. (*See,* p. 21, *supra.*)

Thus, we conclude that it is not possible to eliminate the unsafe feature of the Angiocath without impairing its utility since the costs of the only available alternative product are much higher; the risk associated with the allegedly unsafe design cannot be completely eliminated; and there are problems other than the risk of a needle stick associated with the use of the alternative design which require extensive training to diminish and which cannot be entirely eliminated.

E. *The User's Ability to Avoid Danger by Exercising Care in the Use of the Product*

Despite the suggestion by defendant that plaintiff might somehow have prevented her accident by more careful attention to proper procedures, we find nothing in the record

which establishes that a lack of care on plaintiff's part contributed to her injury. Under the undisputed circumstances, it appears that anyone, using any type of sharp device, might have sustained a similar injury by reacting to a patient's unexpected movement.

Such conclusion with respect to the present accident, however, does not appear to the Court to be truly relevant to our inquiry into this aspect of the risk/utility analysis. In making the required social policy determination, we are concerned with the ability of the users of conventional I.V. catheters, in general, to avoid the risks inherent in the product, not with the particular circumstances of plaintiff's accident. In that regard, it appears that although healthcare workers often fail to take the appropriate precautions, proper safety practices can, to some extent, enable healthcare workers to reduce the risk of needle sticks. *See, e.g.,* Doc. #13, Exh. H, Effect of Changing Needle Disposal Systems on Needle Puncture Injuries:

> The study concluded that while equipment redesign may further decrease the number of needle puncture injuries, individual practice is the most important determinate regarding these incidents. Because over 40% of the needle puncture injuries could have been prevented and considering the continued non-compliance with established needle disposal procedures, further studies are suggested.

(*See, also, Id.,* Exh. E at 157).

In addition, as noted by defendant, special procedures for patients with known blood-borne diseases can be instituted by healthcare facilities in a further effort to protect their employees. (*See, e.g.,* Doc. #10, Exh. D at 153–156 and Exh. D–50 thereto).

We conclude that just as the design of the protected catheter cannot completely prevent needle sticks from the use of I.V. catheters, it is unlikely that even extreme caution and punctilious adherence to recommended procedures can enable a healthcare worker to completely avoid that danger. Nevertheless, it does appear that healthcare facilities and healthcare workers themselves have some ability to reduce the risk inherent in the use of any I.V. catheter by taking appropriate precautions.

## F. The User's Anticipated Awareness of the Dangers and Their Avoidability

The sheer size of the record produced in support of and in opposition to the instant motion, including many articles written for healthcare providers concerning the risks of exposure to blood-borne diseases from needle sticks, indicates that there is widespread knowledge of the potential danger of a needle stick accident among healthcare workers. Indeed, plaintiff does not contend that the danger inherent in an exposed needle is hidden, generally unknown to healthcare workers, or that she was personally unaware of such danger.

## G. Feasibility on the Part of the Manufacturer of Spreading the Loss

As noted by the court in *Monahan v. Toro,* although it is unquestionably true that a manufacturer is almost always able to spread the cost of an injured plaintiff's loss over all users of a product by raising the price thereof, the feasibility of doing so depends upon balancing the remaining factors in the risk/utility analysis, *i.e.,* examining the usefulness of the product in itself and as compared to the disadvantages and cost of any available substitute, and examining the user's awareness of the danger and ability to reduce the unavoidable risks of the product by taking appropriate precautions. In other words, according to the *Monahan* court, when consideration of the preceding six factors leads to the conclusion that the utility of product in question outweighs its risks, such determination compels the further conclusion that shifting the cost of plaintiff's loss to the manufacturer of the product is not fair, and, therefore, not feasible.

Application of that formula indicates that cost-shifting to the supplier is not appropriate, and, therefore, not "feasible" in this case since we have concluded that the Angiocath is unquestionably a useful product in which a very small risk of injury is inherent in the alleged design defect, an exposed needle which has contacted a patient's blood. We have also concluded that an alternative design which can, but does not always, elimi-

nate that feature of the product likewise reduces its utility because of much higher costs and because of problems associated with other aspects of the alternative design. Finally, we concluded that the danger of the alleged design defect is obvious, well-known to users thereof, and can be reduced with appropriate precautions.

Expanding upon the analysis of the *Monahan* Court, we note that the feasibility of expecting a manufacturer to spread the cost of injuries from a particular product to all users thereof must necessarily depend upon the need for the product in question, the desirability of assuring that it remains on the market despite its inherent danger, and the effect on the plaintiff of a decision not to shift the cost of the injury to the manufacturer of the product.

As plaintiff suggests, a conclusion by the Court that the manufacturer of the Angiocath may be required to assume responsibility for compensating those injured while using it could lead to its withdrawal from the market, or, at least, to such a substantial increase in its cost as to minimize or eliminate the cost differential between the Angiocath and the alternative product, the ProtectIV, potentially leading to increased acceptance of the needle-sheathing design.[11] The Court must, therefore, determine whether, as the plaintiff vigorously contends, that result is desirable and should be encouraged.

Based upon a consideration of all the evidence, we conclude that such a potential manipulation of the market for peripheral I.V. catheters should not be undertaken as a consequence of one of three tragic accidents which occurred during 16 years of experience with defendant's I.V. catheter products by a multitude of healthcare workers, especially where the alternative product is certainly not without its own dangers and other drawbacks and where the product in question appears to be functionally superior to the alternative in all respects other than leaving the needle exposed after it is withdrawn from the catheter.

Moreover, we conclude that in this case, there would be no adverse effect to plaintiff or to the public in general as a result of not shifting the costs of plaintiff's injury to the manufacturer of the product, thereby allowing the costs to remain where they are currently allocated: on the plaintiff's employer via the Workmen's Compensation system. At the time of plaintiff's accident, Community Hospital of Lancaster required the use of the Angiocath by refusing to purchase the alternative product. Although, as noted, it is impossible to determine whether plaintiff's accident could have been prevented by use of a different I.V. catheter, if the Angiocath was not the best or safest product for plaintiff to use under the circumstances which existed at the time of her accident, the fact that she had no choice but to proceed with the use of a less desirable alternative was due entirely her employer's decision. Hence, it would be unfair to expect the manufacturer of the Angiocath to spread the costs of plaintiff's injury to all users thereof, including those healthcare facilities which might take more care to assure that a variety of products are available to their staffs in order to permit their employees to select the most appropriate device for various circumstances.

On the other hand, if plaintiff's accident could not have been prevented by use of a different I.V. catheter, it is manifestly unjust to shift the costs of plaintiff's injury to all users of the product she happened to be using at the time of the accident.

Thus, following the *Monahan* court and assuming that the terms fair and feasible are interchangeable in the context of the last factor of the risk/utility analysis, we conclude that it is not feasible to expect the defendant to spread the costs of plaintiff's injury over

11. Indeed, the experience of plaintiff's employer, Community Hospital of Lancaster, provides a paradigm for the effect of assuming the high cost of a very serious, albeit rare injury.

Prior to plaintiff's injury and the consequent costs of providing Workmen's Compensation as a result thereof, the hospital had evaluated and rejected the option of substituting the ProtectIV for the Angiocath. Subsequently, however, despite the far higher cost of the alternative product, despite functional problems leading to complaints and the need for extensive training of the staff, and despite the inability to make a complete substitution, the ProtectIV was introduced and remains in general use in the hospital.

all users of the Angiocath since such a result would unjustifiably raise the cost of a product which, although dangerous, carries a very small risk of serious injury and is highly useful. In addition to the desirability of the Angiocath remaining available at a reasonable cost to healthcare workers because of its utility, the circumstances underlying plaintiff's claim lead to the conclusion that shifting the costs of her injury to the defendant and, hence, to the public in the form of higher costs for I.V. catheters in general is unjustified in light of the determining role played by plaintiff's employer in her use of that particular product at the time of the accident.

## H. Summary

Having examined each factor in the risk/utility analysis which both parties agree is applicable to this case in the light of the available evidence, we conclude that the Angiocath, although dangerous because it is capable of causing serious injury, is not unreasonably dangerous as that term is defined in Pennsylvania law.

Putting our conclusion in terms of the *Barker v. Deere & Co.*, formulation of the risk/utility analysis under Pennsylvania law, we likewise conclude that the Angiocath cannot be considered unreasonably dangerous in that, in most instances the danger inherent in a needle stick is not grave, since most needle sticks do not expose the injured party to a serious illness, and even when exposed to HIV, only a small percentage of injured parties become infected. Moreover, needle sticks from I.V. catheters, specifically, are relatively rare and the likelihood of a resulting serious injury, defined herein as exposure to HIV/HIV infection, is slight in comparison to the widespread use of the product.

Although a feasible design which appears to reduce the risk of a needle stick injury is available, the potential reduction of the risk of a needle stick comes at a greatly increased cost and it is by no means certain that such design is truly "safer" overall since the available product which incorporates the alternative design is not as well-suited as the Angiocath to the primary purpose of an I.V. catheter, quick and efficient piercing of the skin and subcutaneous tissue for access to a vein.

No matter how the risk/utility test is formulated, application thereof leads to the conclusion that the Angiocath is a highly desirable product which can be used with little risk of serious injury, and, therefore that, as a matter of social policy the risk of loss from injuries occurring to persons using it should not be allocated to the manufacturer thereof since the product is not unreasonably dangerous, and, hence, is not defective as a matter of law.[12]

## IV. "SOCIAL POLICY" TEST

■ As noted, plaintiff contends that in addition to the risk/utility analysis, Pennsylvania law provides for a more general social policy test whereby the Court determines whether imposing liability upon the manufacturer of the product in question would further the purpose of strict liability. (*See*, Doc. # 13 at 11). As stated by plaintiff, such purpose is to assure that the costs of injuries from defective products are borne by the manufacturers thereof rather than by injured parties. (*Id.* at 12). Although we cannot disagree with plaintiff's contention that the Court is required to engage in a social policy analysis in order to determine whether a particular product is unreasonably dangerous, we likewise cannot agree that such analysis is separate from the risk/utility analysis. The result of examining the product in terms of the specific factors included therein is a determination that the product is or is not unreasonably dangerous. If the Court con-

---

12. We note that the social policy analysis undertaken in connection with the question whether strict liability may be imposed upon a manufacturer pursuant to Pennsylvania law is narrowly focused on the appropriateness of allocating the risk of loss from injuries sustained during use of a particular product to the manufacturer thereof. Such analysis does not, and should not, stray into issues such as the general desirability of reducing injuries connected to use of the product or the best means of doing so. Thus, our conclusion that the Angiocath is not unreasonably dangerous cannot be equated to a conclusion that nothing can or should be done to develop or encourage the use of products which may ultimately reduce the incidence of needle stick injuries to healthcare workers.

cludes that it is unreasonably dangerous, social policy demands that the costs of injuries caused by the product be allocated to the manufacturer. Thus, it would be an incorrect application of Pennsylvania law to conclude that a product is unreasonably dangerous but that it would not further the purpose of strict liability to shift the costs of injuries resulting from use of the product to the manufacturer.

It would likewise be an incorrect application of Pennsylvania law to shift such costs to the manufacturer despite a conclusion that a product is not unreasonably dangerous, and, hence, not defective. Consequently, we conclude that there can be no separate test which depends upon some unfocused and amorphous consideration of the purpose of strict liability. Indeed, since only the costs of injuries resulting from defective products may be shifted to the manufacturer pursuant to Pennsylvania law, it is impossible to further the purpose of the law of strict liability without a determination that a product is unreasonably dangerous, *i.e.*, defective. Such determination results from proper application of the risk/utility analysis.

Moreover, as plaintiff describes the separate "social policy" test purportedly applicable to product liability claims, it appears to be the functional equivalent of the feasibility of cost-shifting previously discussed in connection with the seven factor risk/utility test. As discussed in detail in that regard, *supra.*, we have already concluded that shifting the costs of plaintiff's injury to the defendant in this case is unfair.

Nevertheless, we agree that Pennsylvania law provides for a general social policy test which focuses on the desirability and advisability of shifting from an injured plaintiff to a third-party the responsibility for paying the costs associated with an injury. Such social policy test, however, does not focus exclusively upon manufacturers as the responsible third-party. Rather, as noted, the manufacturer is responsible only when a product is defective. In other circumstances the costs are shifted to a person who intentionally caused the injury or to a person who failed to exercise reasonable care under the circumstances, *i.e.*, was negligent. Finally,

as here, the social policy of Pennsylvania as expressed in its Workmen's Compensation statute provides for shifting the costs of an injury to an employer when the injury occurs during the course and scope of employment.

As noted, such cost-shifting is particularly appropriate in this case, since the injury actually arose from the terms and conditions of plaintiff's employment, not merely during the course and scope thereof. It is clear, therefore, that to the extent plaintiff contends that, as an innocent party, she should not be forced to bear the costs of her injury, Pennsylvania's social policy, here expressed in statutory law, agrees and provides a remedy. It is unnecessary, therefore, as well as unjustified as a matter of social policy, to shift the costs of plaintiff's injuries to the manufacturer of the Angiocath when such costs are already properly allocated to a third-party, her employer.

## V. PREEMPTION

█ Defendant argues that a decision by the FDA not to require a shielding device designed to reduce the potential for needle sticks on I.V. catheter stylets and other needles operates as a federal regulatory preemption of strict liability claims against manufacturers of unshielded devices. Defendant notes that states are not permitted to impose more stringent requirements on medical equipment regulated under the federal Medical Device Amendments to the Food, Drug and Cosmetic Act, 21 U.S.C. § 360a, *et seq.*, and contends that permitting a strict liability claim based upon the lack of such a device amounts to a more stringent regulation of needle-bearing devices than is imposed by federal law.

We cannot agree, however, that the FDA's refusal to develop standards on needle-bearing devices, in this instance, has a preemptive effect on tort claims brought pursuant to state law.

█ The recent Supreme Court decision in *Freightliner v. Myrick,* —— U.S. ——, 115 S.Ct. 1483, 131 L.Ed.2d 385 (1995), makes it clear that a federal agency's decision not to regulate in an area does not always or automatically have a preemptive effect on state

law regulation in the same area. Indeed, in *Myrick,* the Court specifically held that product liability claims against two truck manufacturers were not preempted by a National Highway Traffic Safety Administration (NHTSA) standard which had been established but was not then in effect. The Court noted that the absence of an express federal standard governing anti-lock braking systems on trucks precluded preemption of common law claims alleging that the lack of such systems constituted a design defect for which liability could be imposed upon the manufacturers of the trucks.

As noted by defendant, the Court in *Myrick* recognized that a decision by an agency not to exercise its authority to regulate can amount to a ruling that regulation in that area is inappropriate, and, hence, can thereby constitute a preemptive regulation. The Court, however, appeared to limit the preemptive force of such non-regulation to situations in which Congress "intended to centralize all authority over the regulated area in ... the Federal Government." ——— U.S. at ———, 115 S.Ct. at 1487, 131 L.Ed.2d at 392. Noting that there was no evidence in *Myrick* that NHTSA had determined that trucks should be free of state regulation with respect to stopping distances and vehicle stability, the Court declined to hold that the absence of a regulation concerning a specific braking system carried preemptive force.

In this case, although there is a general federal statutory and regulatory prohibition against state requirements for medical devices, defendant has not attempted to demonstrate that the FDA's decision was intended as an affirmative regulation establishing that needle-bearing devices should not be subject to any type of design standard. Under *Myrick,* it does not appear to be sufficient to conclude that regulation may be implied from the lack of a standard without demonstrating, at least, that the FDA intended to maintain sole authority over the regulation of needle-bearing devices.

■■■ Indeed, the FDA itself appears to have answered in the negative the question whether a decision not to impose requirements on a medical device amounts to a determination that regulation is not appro-

priate, and, therefore, has preemptive force. As noted by the court in *Oliver v. Johnson & Johnson, Inc.,* 863 F.Supp. 251 (W.D.Pa. 1994), the FDA has affirmatively stated that state and local requirements are preempted only when the FDA has adopted specific regulations or requirements with respect to a particular device. *See, also,* 21 C.F.R. § 808.1(d). Thus, by implication, it does not appear that defendant could establish an intent by the FDA to preclude all state standards from the absence of requirements or regulations concerning a specific medical device since the FDA appears to limit the preemptive force of its decisions to affirmatively established regulations and standards.

We also decline to predict whether the Pennsylvania Supreme Court would, as a matter of social policy, consider the FDA's decision not to require protected needles a legally sufficient determination that unprotected needles are not unreasonably dangerous, and, on that basis alone, would refuse to subject manufacturers to liability for injuries related to needle-bearing devices. Since it appears that the FDA based its decision not to mandate shielded needles upon factors similar to those considered by this Court in connection with the risk/utility analysis, it makes no difference whether our conclusion that the Angiocath is not unreasonably dangerous springs from a full risk/utility analysis or is simply based upon deference to the FDA's decision not to regulate. Thus, it is unnecessary to attempt to determine the legal effect of the FDA's decision on the threshold inquiry into product liability claims under Pennsylvania law.

## VI. CONCLUSION

Having carefully considered the extensive evidence, arguments of counsel and other submissions of the parties in connection with a risk/utility analysis undertaken pursuant to Pennsylvania law governing strict liability claims, we conclude that the product in question, the Angiocath peripheral I.V. catheter manufactured and sold by defendant, is not unreasonably dangerous, and, therefore, is not defective as a matter of law. Accordingly, defendant's motion for summary judg-

ment will be granted and judgment will be entered in favor of the defendant.

### ORDER

And now, this 27th day of December, 1995, upon consideration of defendant's Motion for Summary Judgment, (Doc. # 10), and plaintiff's response thereto, **IT IS HEREBY ORDERED** that the motion is **GRANTED.**

**IT IS FURTHER ORDERED** that judgment is entered in favor of the defendant and against the plaintiff.